828 So.2d 502 (2002)
Alvin CAMPO, individually and on behalf of the minor Children, Joshua Hall Campo and Jessi Lynn Campo, and Pamela Campo
v.
Amilcar CORREA, M.D., and Galen-Med, Inc. (f/k/a Humedicenter, Inc., f/d/b/a Humana Hospital-New Orleans).
No. 2001-C-2707.
Supreme Court of Louisiana.
June 21, 2002.
*504 Oscar L. Shoenfelt, III, Baton Rouge, Counsel for Applicant.
Kelly E. Barbier, Gina A. Gennusa, Thomas A. Gennusa, II, Metairie, Franklin D. Beahm, New Orleans, Joseph E. Windmeyer, Jr., Metairie, BEAHM & GREEN; Scott W. Smith, Counsel for Respondent.
KNOLL, Justice.
This medical malpractice case primarily addresses two prescription issues concerning the date of discovery. The initial issue before us is whether the plaintiffs' petition was prescribed on its face when plaintiffs' claims are brought within one year from the date of discovery, but not more than three years from the alleged act of malpractice. As to this issue, there is a split among the circuits. The second question before us, which is complementary to the first issue, is whether the alleged medical malpractice victim was reasonable in not discovering within a year of his medical treatment that his condition may have been related to his hospital stay and his surgical treatment. For the following reasons, we find the lower courts erred as a matter of law in finding the plaintiffs' petition was prescribed on its face and further conclude, after conducting a de novo review, that the plaintiffs' alleged malpractice action has not prescribed.

FACTS
In November 1989, Alvin Campo fell and injured his back and neck while visiting at Baptist Hospital. After providing initial treatment to Campo for several weeks, Dr. John D. Olson, a neurologist, referred Campo to Dr. Amilcar Correa, a neurosurgeon, for further medical care and treatment. Dr. Correa admitted Campo to Humana Hospital-New Orleans (hereafter "hospital"),[1] and on July 27, 1990, he performed an anterior cervical diskectomy and fusion at C5-6. After this surgery, Campo's neck symptoms improved and he *505 required no further treatment for this problem.
Later, on February 28, 1991, Dr. Correa admitted Campo to Humana Hospital for a lumbar myelogram which was performed there on March 1, 1991.[2] Because of Campo's continued pain in the lumbar region, Dr. Correa recommended lumbar surgery. Campo and his wife, Pamela, acknowledged that prior to this surgery, Dr. Correa advised them that possible complications of surgery included leakage of cerebral spinal fluid (CSF) and infection; the doctor further told them that he could not guarantee the surgery would eliminate Campo's back pain. With the knowledge of the attending risks, Campo signed a consent form to allow Dr. Correa to perform the recommended lumbar surgery. Thereafter, on April 10, 1991, Dr. Correa surgically removed parts of the bony arch of Campo's lumbar spine (a laminectomy) at Humana Hospital.
Within weeks after the lumbar surgery, Campo developed a spinal fistula at the site of the lumbar myelogram and he was diagnosed with a CSF leak. After conservative blood patch therapy failed, on May 7, 1991, Dr. Correa returned Campo to the operating room and inserted a lumbar peritoneal shunt to treat the CSF leakage. Thereafter, while still in the hospital, Campo developed an infection, namely spinal meningitis, which required him to remain in the hospital until May 27, 1991. Dr. Correa continued to treat Campo post-operatively until sometime in October 1991.
Campo then returned to Dr. Olson, the neurologist who treated him prior to surgery, for post-operative care. Campo complained of pain in the lumbar region which had not subsided after Dr. Correa's surgery.[3] Dr. Olson saw Campo off and on for several years for his lumbar pain. In October 1993, Dr. Olson recommended that Campo begin treatment with Dr. Charles R. Billings, a neurosurgeon. On October 26, 1993, Dr. Billings examined Campo and opined that Dr. Correa's use of the peritoneal shunt was improper and that he had segmental instability at L4-5 because of Dr. Correa's use of the shunt. According to Campo's petition, this was the first time he became aware that Dr. Correa may have committed an act of medical malpractice.
On March 1, 1994, less than five months after Dr. Billings informed Campo of the improper use of the shunt and its consequences, Campo, individually and on behalf of his two minor children, together with his wife, Pamela Campo, filed a medical malpractice complaint with the Patient's Compensation Fund, alleging that Dr. Correa and Humana Hospital had improperly provided medical care to Campo. Later, on April 1, 1996, a medical review panel ruled that although Dr. Correa had breached the standard of care in the placement of the peritoneal shunt, the shunt was not responsible for his medical problems and pain. Instead, the panel concluded that all of Campo's complaints stemmed from recognized complications of back surgery. The medical review panel also opined that no evidence was presented *506 to it to establish Humana's alleged improper medical care.
On May 28, 1996, Campo, individually and on behalf of his two minor children, and his wife, Pamela, individually, (hereafter collectively referred to as the Campos) filed a medical malpractice action in the district court against Dr. Correa and the hospital.[4] They further alleged with particularity that they were unaware of any possible medical malpractice until October 26, 1993, when Campo first saw Dr. Billings and thus their claim was timely filed.[5] On April 18, 1998, the Campos filed a first supplemental and amending petition to further allege that Campo developed an infection which he contracted during the surgical procedure and/or during his hospitalization. Subsequently, on April 26, 1999, the Campos filed a second supplemental and amending petition to allege that Roberto Salcedo, one of Dr. Correa's employees, was allowed to treat Campo during his hospitalization even though he was not a physician licensed to practice in Louisiana and he did not have staff privileges at the hospital.[6] More than five years after the Campos filed their medical malpractice complaint, the hospital and Dr. Correa, respectively, filed peremptory exceptions of prescription on July 8, 1999, and September 14, 1999.[7]
The trial court sustained both exceptions of prescription. Finding that the Campos' claim was prescribed on its face, the trial court shifted the burden to the Campos to *507 prove that Campo did not/could not have known of the essential facts underlying the medical malpractice claim. The trial court found that due to the pain and infection which immediately followed his lumbar surgery, Campo should have known that something was wrong and that a reasonable man in Campo's circumstances should have obtained a second opinion from another physician such as Dr. Billings less than twenty-nine months after his release from the hospital. The trial court then concluded that even if it based the act of negligence upon the act that occurred last in chronological order, i.e., the shunt surgery, the claims against the hospital and Dr. Correa were prescribed because it was filed more than a year after Campo should have been aware of his claims.
The appellate court first affirmed the trial court's finding that the Campos' petition was prescribed on its face. The court of appeal, relying on a manifest error standard of review, then analyzed the trial court's finding that the plaintiffs failed to show that there were sufficient facts to justify an interruption of prescription. Finding no manifest error in the trial court's determination, the appellate court found that the Campos' claims against the hospital and Dr. Correa were prescribed because Campo knew or should have known something was wrong and should have been more timely in seeking a second medical opinion. As justification for this finding, the reviewing court pointed out that Dr. Correa immediately informed Campo of the spinal leak and the infection, and that Campo suffered continuous lower back pain post-surgery, even though he had not experienced such pain after his earlier successful cervical surgery.
To summarize, for purposes of determining whether the Campos' petition was prescribed on its face, it is clear that the trial court and the court of appeal only looked to the dates that were "within one year from the date of the alleged act, or omission or neglect." It is equally clear that the lower courts did not consider the date "within one year from the date of discovery" in determining whether plaintiffs' petition was prescribed on its face, and shifted the burden of proof to the plaintiffs to prove that prescription had been sufficiently interrupted, so as to bring their action within the prescriptive period.
We granted the Campos' writ application to resolve a split among the circuits on the issue of whether to consider the date of discovery in determining whether the petition in a medical malpractice action is prescribed on its face, and to examine the correctness vel non of whether the Campos were reasonable in not discovering the alleged malpractice acts sooner than alleged. Campo v. Correa, 2001-2707 (La.1/11/02), 806 So.2d 653.

DISCUSSION
There is a split among the circuit courts on the issue of when a plaintiff's petition is prescribed on its face in medical malpractice actions when the claim is brought within one year from the date of discovery. The First, Second, and Third Circuits look to the pleadings to see if allegations are made with which to determine whether the petition was filed within one year of the date of the plaintiff's discovery, either actual or constructive, of the act of medical malpractice. Abrams v. Herbert, 590 So.2d 1291 (La.App. 1 Cir.1991); Chandler v. Highland Clinic, 28,204 (La.App. 2 Cir.4/03/96), 671 So.2d 1271, 1273; and Leyva v. Laga,[8] 549 So.2d 914, 916 (La. *508 App. 3 Cir.1989). As exemplified in the present case, the Fourth Circuit looks solely to see if the petition was filed within one year of the physician/hospital's last act upon which negligence is based, and does not examine whether suit was filed within one year of the plaintiff's discovery of the act of medical malpractice. Campo v. Correa, XXXX-XXXX (La.App. 4 Cir. 9/5/2001), 797 So.2d 115, 118; see also Acosta v. Campbell, 98-2538 (La.App. 4 Cir. 8/11/99), 744 So.2d 112, writ denied, 99-2651 (La.11/19/99), 749 So.2d 683 (holding that even though the plaintiff's petition includes allegations invoking the "discovery rule" as a defense to the running of prescription, the evidentiary burden was on the plaintiff to establish that the defendants' exceptions of prescription should be overruled).
It is well established that the action for medical malpractice sounds in negligence. LA.REV.STAT. ANN. § 40:1299.41(A)(8). The plea of prescription must be specifically pleaded, and may not be supplied by the court. LA.CODE CIV. PROC. ANN. art. 927(B). Ordinarily, the exceptor bears the burden of proof at the trial of the peremptory exception. Spott v. Otis Elevator Co., 601 So.2d 1355, 1361 (La.1992). However, if prescription is evident on the face of the pleadings, the burden shifts to the plaintiff to show that the action has not prescribed. Williams v. Sewerage & Water Bd. of New Orleans, 611 So.2d 1383, 1386 (La.1993).
The prescriptive period for medical malpractice is provided in LA.REV.STAT. ANN. § 9:5628. At the time of the alleged medical malpractice in 1991, LA.REV.STAT. ANN. § 9:5628 provided, in pertinent part:
A. No action for damages for injury or death against any physician, chiropractor, dentist, psychologist, hospital duly licensed under the laws of this state, or community blood center or tissue bank as defined in R.S. 40:1299.41(A), whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, or omission or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; provided, however, that even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect.
Commenting on this revised statute in Hebert v. Doctors Memorial Hosp., 486 So.2d 717 (La.1986), we stated:
La.Rev.Stat. § 9:5628 sets forth more than one time period. Initially, it coincides with La.Civ.Code art. 3492's basic one year prescriptive period for delictual actions, coupled with the "discovery" exception of our jurisprudential doctrine of contra non valentem ("within one year from the date of the alleged act, omission or neglect, or within one year from the date of discovery of the alleged act, omission or neglect"). A separate and independent feature, or provision, of § 9:5628 is contained in the following clause:
provided, however, that even as to claims filed within one year from the date of discovery, in all events such claims must be filed at the latest within a period of three years from the date of the alleged act, omission or neglect.

*509 * * *
[W]e conclude that La.Rev.Stat. § 9:5628 is in both of its features noted above a prescription statute, with only the single qualification that the discovery rule is expressly made inapplicable after three years from the act, omission or neglect.
Hebert, 486 So.2d at 723-24; (emphasis added).
In summation, we effectively held that LA.REV.STAT. ANN. § 9:5628 not only corresponds with the basic one year prescriptive period for delictual actions provided in LA. CIV.CODE art. 3492, it embodies the discovery rule delineated as the fourth category of contra non valentem, that is with the "single qualification that the discovery rule is expressly made inapplicable after three years from the act, omission or neglect." Hebert, 486 So.2d at 724; see also Fontenot v. ABC Ins. Co., 95-1707 (La.6/7/96), 674 So.2d 960, 963; White v. West Carroll Hospital, Inc., 613 So.2d 150, 155 (La. 1992) (holding that LA.REV.STAT. ANN. § 9:5628 embodies contra non valentem in medical malpractice suits).
A straight forward reading of LA. REV.STAT. ANN. § 9:5628 clearly shows that the statute sets forth two prescriptive limits within which to bring a medical malpractice action, namely one year from the date of the alleged act or one year from the date of discovery with a three year limitation from the date of the alleged act, omission or neglect to bring such claims. Hebert thoroughly examined the legislative history of LA.REV.STAT. ANN. § 9:5628 and determined that it was clearly a "prescription statute with a qualification, that is, the contra non valentem type exception to prescription embodied in the discovery rule is expressly made inapplicable after three years from the act, omission or neglect." Hebert, 486 So.2d at 724-25. Thus, a petition should not be found prescribed on its face if it is brought within one year of the date of discovery and facts alleged with particularity in the petition show that the patient was unaware of malpractice prior to the alleged date of discovery, and the delay in filing suit was not due to willful, negligent, or unreasonable action of the patient.
We find that the trial court and the Court of Appeal, Fourth Circuit, erred as a matter of law when they found that the Campos' petition was prescribed on its face. Although the Campos' petition was filed more than one year after the date of the last act of the hospital and Dr. Correa's last act upon which negligence was alleged, the plaintiff's pleadings made a prima facie showing that it was filed "within one year from the date of discovery" and "within a period of three years from the date of the alleged act, omission or neglect." LA.REV.STAT. ANN. § 9:5628(A).[9] Accordingly, the lower courts erred as a matter of law in shifting the burden to the Campos to prove prescription was interrupted. Therefore, we find that the burden of proof at the trial of the peremptory exception rested upon the hospital and Dr. Correa, the exceptors.[10]
*510 DE NOVO REVIEW
Where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the reviewing court should make its own independent de novo review and assessment of the record. Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 746-47; Gonzales v. Xerox Corp., 320 So.2d 163 (La. 1975). More specifically, when reviewing courts have found the lower courts of this state utilized an improper burden of proof, the jurisprudence has recognized that such an error may have interdicted the fact-finding process and calls for a de novo review of the evidence. Ferrell, 650 So.2d at 746-47; Duncan v. Safeway Ins. Co. of La., 35,240 (La.App.10/31/01), 799 So.2d 1161, 1163; Valley v. Specialty Restaurant Corp., 98-0438 (La.App. 4 Cir. 1/19/99), 726 So.2d 1028, 1032; Dousay v. Allstate Ins. Co., 99-32 (La.App. 3 Cir. 6/2/99), 741 So.2d 750, 753.
Even though we, like the appellate court, have appellate jurisdiction of both law and fact in civil matters, and may perform an independent review and render judgment on the merits, see Buckbee v. United Gas Pipe Line Co., 561 So.2d 76 (La.1990) (citing LA. CONST. art. V, § 5(C) and Thomas v. Missouri Pacific R.R. Co., 466 So.2d 1280 (La.1985)), we have not always chosen to conduct a de novo review of the record. Our reasons for opting not to conduct a de novo review is usually prompted by two considerations. First, in its error correcting function, the appellate courts of this state are charged with the primary responsibility of reviewing the trial court's factual findings. Second, we have consistently recognized that the "proper allocation of functions between the lower appellate courts and the Supreme Court is best served by consigning the first appellate review to the court of appeal and preserving to this Court discretionary review upon the litigant's petition for certiorari." Buckbee, 561 So.2d at 87 ((citing Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973)) for the proposition that the preservation of the proper allocation of functions between the trial and appellate courts is one reason the appellate courts adhere to the manifest error standard of review). However, in the instant case, notwithstanding the legal error, the evidence concerning the issues before us was fully developed. Thus, a remand to the district court would serve no purpose. Likewise, since the court of appeal has already fleshed out the salient facts in its review, a remand to it is unnecessary. Under these circumstances, we will conduct a de novo review because of the error of law and determine whether the date of discovery was reasonable.

REASONABLENESS OF DATE OF DISCOVERY
Prescription commences when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort. Percy v. State, E.A. Conway Memorial Hosp., 478 So.2d 570 (La.App. 2 Cir.1985). A prescriptive period will begin to run even if the injured party does not have actual knowledge of facts that would entitle him to bring a suit as long as there is constructive knowledge of same. Constructive knowledge is whatever notice is enough to excite attention and put the *511 injured party on guard and call for inquiry. Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead. Such information or knowledge as ought to reasonably put the alleged victim on inquiry is sufficient to start running of prescription. Ledet v. Miller, 459 So.2d 202 (La.App. 3 Cir.1984), writ denied, 463 So.2d 603 (La.1985); Bayonne v. Hartford Insurance Co., 353 So.2d 1051 (La.App. 2 Cir.1977); Opelousas General Hospital v. Guillory, 429 So.2d 550 (La.App. 3 Cir.1983). Nevertheless, a plaintiff's mere apprehension that something may be wrong is insufficient to commence the running of prescription unless the plaintiff knew or should have known through the exercise of reasonable diligence that his problem may have been caused by acts of malpractice. Gunter v. Plauche, 439 So.2d 437, 439 (La.1983). Even if a malpractice victim is aware that an undesirable condition has developed after the medical treatment, prescription will not run as long as it was reasonable for the plaintiff not to recognize that the condition might be treatment related. Griffin v. Kinberger, 507 So.2d 821 (La.1987). The ultimate issue is the reasonableness of the patient's action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct. See Griffin, 507 So.2d at 821.
In the present case, the trial court heard the peremptory exceptions of prescription filed by the hospital and Dr. Correa, respectively, in separate proceedings and took evidence in the trial of both.[11] In addition to excerpts from the depositions of Campo, Dr. Olson, and Dr. Correa, Campo's wife, Pamela, testified at both proceedings. Because the facts applicable to Dr. Correa and the hospital overlap, we will combine our analysis of the prescription issue that is based upon the date of discovery, an issue that is common to both defendants.
With regard to the hospital, our review of the Campos' original and supplemental petitions shows that the allegations against the hospital primarily focus on whether the hospital environment was a causative agent in Campo's post-operative infection and whether it properly exercised control or failed to properly control Dr. Correa and his employees. With regard to Dr. Correa, the Campos' petitions, original and supplemental, basically allege that Dr. Correa's use of the peritoneal shunt was improper, that he failed to properly evaluate and monitor him, that his follow-up care was inappropriate, and that he allowed at least one of his employees, an unlicensed physician, to treat him during his hospitalization.
Relying on the same analysis used by the appellate court, the hospital and Dr. Correa contend that Campo knew in May 1991 that he suffered CSF leakage and subsequently developed meningitis, that he complained of constant pain post-surgery, that he had good results from his first cervical surgery Dr. Correa performed, that there was no continuing relationship between Campo and the hospital after his discharge on May 27, 1991, and that Dr. Correa last treated Campo in October 1991. Although the Campos do not deny these facts, plaintiffs urge that their petition was timely filed against the hospital *512 and Dr. Correa because they had no knowledge of malpractice on the part of Dr. Correa until Dr. Billings told Campo on October 26, 1993, that Dr. Correa's utilization of the peritoneal shunt was improper.[12] Simply stated, the Campos assert that in light of the facts of this case, the defendants failed to establish by a preponderance of the evidence that their inaction was unreasonable.
Even though the plaintiffs' petition shows that Campo's last professional visit to the hospital was May 27, 1991, and Dr. Correa's last treatment of Campo was in October 1991, it was incumbent upon the hospital and Dr. Correa to show that their alleged misconduct was either apparent or discoverable before October 1993, the date of Dr. Billings' opinion of malpractice relative to Dr. Correa,[13] and the Campos failed to file suit within one year of that knowledge.
From the outset, we find no merit in the contention that Campo should have been put on guard because he had previously undergone cervical spine surgery by Dr. Correa which resulted in almost immediate pain relief. The only testimony on this point is that of Campo. In his deposition, Campo stated that he did not think that Dr. Correa had done anything wrong because he (Dr. Correa) kept "telling me it's a totally different surgery; it involved a totally different part of the body; so naturally, it's going to take a different amount of time to heal."[14]
We likewise find that neither the hospital nor Dr. Correa can find solace in the fact that Dr. Correa immediately informed Campo that he suffered spinal fluid leakage from a fistula at the myelogram site and that he developed meningitis following the May 1991 surgery implanting the shunt. The jurisprudence is well established that the mere fact there is an injury during or following medical care or treatment is not an indication of substandard care that either the physician or hospital provided. See LA.REV.STAT. ANN. § 9:2794(C);[15]Galloway v. Baton Rouge General Hosp., 602 So.2d 1003 (La.1992) (holding that the mere fact an injury occurs or an accident happens in a hospital raises no presumption or inference of negligence on the part of the hospital); Smith v. Lincoln General Hosp., 27,133 (La.App. 2 Cir. 6/21/95), 658 So.2d 256, writ denied, 95-1808 (La.10/27/95), 662 So.2d 3 (holding that the mere fact an injury occurred does not raise the presumption that the physician was negligent). Moreover, the simple knowledge that an undesirable condition has developed at some time after medical *513 treatment does not equate to knowledge of everything to which inquiry might lead. Kavanaugh v. Long, 29,380 (La.App. 2 Cir. 8/20/97), 698 So.2d 730, writ denied, 97-2554 (La.5/15/98), 719 So.2d 67.
In the present case, the evidence is unrefuted that Dr. Correa specifically advised Campo before the lumbar surgery that both spinal fluid leakage and infection were possible complications which might be expected as a result of lumbar surgery. Likewise, Dr. Correa once again told the Campos post-surgery the infection and the CSF leak were expected complications of the surgery. Although neither of these conditions were definite to occur, they were nonetheless untoward results Dr. Correa prepared Campo to expect as commonly occurring.[16] Accordingly, we do not find it unreasonable for Campo to view these conditions as common risks of this surgery and further that these conditions alone were insufficient to arouse Campo's suspicion that Dr. Correa had committed medical malpractice.
The hospital and Dr. Correa also stress that Campo should have known something was amiss because he suffered constant pain after his low back surgery. The jurisprudence is well established that unsuccessful surgery is not per se an indication of medical malpractice. Gunter, 439 So.2d at 439. Campo further testified that it was his belief that Dr. Correa told him he could experience the same symptoms after surgery that he endured prior to surgery. This court in Griffin, a medical malpractice case, stated that "prescription does not run as long as it was reasonable for the victim not to recognize that the condition may be related to the treatment." Griffin, 507 So.2d at 823; (emphasis added). In the present case, even though Campo candidly admitted that his pain continued and even worsened at times, there is no indication in the record that his condition may have been related to Dr. Correa's insertion of the shunt until Dr. Billings' examined Campo on October 23, 1993.[17]In accord Guitreau v. Kucharchuk, 99-2570 (La.5/16/00), 763 So.2d 575. In light of the conversations Campo and Dr. Correa had post-surgery, we do not find that Campo acted unreasonably in failing to recognize that his medical condition may have been related to Dr. Correa's treatment and his hospitalization. To find otherwise would place an undue burden on Campo to have self-diagnosed the cause of his injury. The alternative argument that the defendants urge and the lower courts adopted, namely that Campo should have gotten a second opinion earlier than Dr. Billings', is also without merit. Given the facts of the present case, the standard that the lower courts adopted would require a patient, who had belief and trust in his doctor, to nonetheless get a second medical opinion to confirm/refute the treating physician's course of treatment. Such an approach would clearly undermine the doctor-patient relationship. Accordingly, we find that the hospital and Dr. Correa failed to prove that the Campos' medical malpractice claims against them were prescribed.

*514 CONCLUSION
LA.REV.STAT. ANN. § 9:5628 provides two prescriptive limits to bring a medical malpractice action, either one year from the date of the alleged act, omission, or neglect or within one year from the date of discovery of the alleged act, omission, or neglect, but not more than three years from the alleged act of malpractice. A petition should not be found prescribed on its fact if it is brought within one year of the date of discovery and facts alleged with particularity in the petition show that the patient was unaware of malpractice prior to the alleged date of discovery, and the delay in filing suit was not due to willful, negligent, or unreasonable action of the patient. In determining whether the date of discovery interrupted prescription, the ultimate issue is the reasonableness of the patient's action or inaction, in light of his or her education, intelligence, the severity of the symptoms, and the nature of defendant's conduct.
We find that the lower courts erred as a matter of law in holding that the Campos' medical malpractice action was prescribed on its face, thereby shifting the burden of proof to plaintiffs at the hearings on the defendants' peremptory exceptions of prescription. After conducting a de novo review of the record, we further find the hospital and Dr. Correa failed to prove that the Campos' petition had prescribed. The date of discovery was not reasonably knowable by Campo until October 23, 1993, when Dr. Billings examined him and informed him that Dr. Correa's use of the peritoneal shunt was improper.

DECREE
For the foregoing reasons, the judgments of the trial court and the court of appeal are reversed, vacated, and set aside. This matter is remanded to the district court for further proceedings.
REVERSED AND REMANDED.
NOTES
[1] As developed in the record, the hospital has changed names or ownership multiple times. In the latest brief that was filed, it refers to itself as Lakeland Medical Center, L.L.C., d/b/a Lakeland Medical Center (f/k/a Galen-Med, Inc. d/b/a Lakeland Medical Center f/k/a Humedicenter, Inc. f/d/b/a Humana Hospital-New Orleans). For consistency, we will simply refer to this entity as the hospital.
[2] Although the record does not definitively establish that Dr. Correa performed the myelogram, Campo's deposition implies this fact.
[3] Even though the record contains an excerpt of Dr. Olson's deposition, the record is void of any evidence of what specific treatment Dr. Olson provided Campo during this time or the number of visits that Campo made between October 1991 and October 1993, the date that Dr. Olson referred Campo to Dr. Billings. The record further fails to illuminate any conversations that Dr. Olson may have had with Campo about Dr. Correa's surgical treatment of Campo's lumbar problem and the resulting CSF leakage and attendant infection.
[4] Included in the Campos' allegations against Dr. Correa and the hospital are that plaintiffs suffered damages because of the defendants' failure to properly perform an operative procedure on the patient, causing injury to the patient, failing to monitor the patient, conducting surgery in an unclean atmosphere and environment, failing to properly treat the patient, failing to properly evaluate the patient, failing to properly follow-up with the patient, failing to use proper care and technique in repairing the CSF leak, and failing to properly credential Dr. Correa.
[5] Paragraphs 14 and 15 of the Campos' petition state, in pertinent part, as follows:

Prior to the surgical procedure performed on Mr. Campo on or about April 10, 1991, Dr. Correa informed Mr. Campo that infection and CSF spinal leakage were known complications of the procedure. Mr. Campo further testified to this under sworn oath in his deposition. Following the surgical procedure, Dr. Correa again told Mr. Campo that the infection and problem in his back were due to known complications of the surgery. Dr. Correa also informed Mr. Campo that it was necessary to put the shunt in on May 7, 1996. This information was not true. Due to the fact that Mr. and Mrs. Campo are lay people and trusted Dr. Correa, they relied on their physician to tell them that the infection and subsequent pain Mr. Campo felt following the surgery were not due to any negligence on behalf of Dr. Correa at Humana Hospital. It was not until the patient, Mr. Campo, saw Dr. Billings on or about October 26, 1993, ... [t]hat [they] had any information which caused them to suspect that the treatment by Dr. Correa and/or the hospital may have been inappropriate. Particularly, the fact that the shunt should not have been inserted.
[6] In particular allegations against the hospital, the Campos alleged that the hospital was negligent in the following additional respects: failing to properly credential Dr. Correa and his employees, failing to properly monitor Dr. Correa and his employees, and failing to properly review Dr. Correa's medical records at the hospital. The Campos further allege that on or about November 11, 1991, after Campo's hospitalization, the hospital suspended Dr. Correa's hospital privileges.
[7] On July 18, 1999, Alvin Campo died of cancer, a medical condition not related to this malpractice litigation. On November 29, 1999, Pamela Campo, Campo's wife, was substituted individually and as the court-appointed tutrix for the minors, Joshua Paul Campo and Jessi Lynn Campo, and was made a party plaintiff in lieu of their deceased husband and father.
[8] Notwithstanding this holding in Leyva, in Taussig v. Leithead, 96-960 (La.App. 3 Cir. 2/19/97), 689 So.2d 680, the Third Circuit held that even though the plaintiff alleged in the petition that she discovered the negligent acts just prior to filing suit, the plaintiff bore the burden of proving the claim had not prescribed if the petition reveals that the suit was filed more than a year after the tort. Thus, even within the Third Circuit there is a split among panels on this issue.
[9] As with other pleadings, the plaintiffs must initially allege facts with particularity which indicate that the injury and its causal relationship to the alleged misconduct were not apparent or discoverable until within the year before the suit was filed. See n.3. supra, which outlines the Campos' allegations in this regard. Through discovery the defendants may then test these facts.
[10] Contrary to the defendants' assertion, our decision today does not conflict with our earlier holding in Whitnell v. Menville, 540 So.2d 304 (La.1989). In that case, we held that the burden of proof rested on the plaintiff. The facts, however, greatly differed from those of the present case. In Whitnell, not only was the plaintiff's medical malpractice action filed more than one year after the alleged act, it was filed well beyond the three year period set forth in LA.REV.STAT. ANN. § 9:5628, the outermost window for filing an action. Accordingly, in that case we properly held that the petition was prescribed on its face and the burden of proof correctly rested with the plaintiff to possibly show that the third category of contra non valentem applied.
[11] As provided in LA.CODE CIV. PROC. ANN. art. 927, evidence may be introduced to support or controvert the exception of prescription, when the grounds thereof do not appear from the petition. In this regard, LA.CODE EVID. ANN. art. 1101(B)(8), the Louisiana rules of evidence apply fully in the trial of an exception or motion that involves "questions of fact... dispositive of or central to the disposition of the case on the merits, or to the dismissal of the case...."
[12] According to the excerpt of Dr. Olson's deposition taken on June 12, 1998, which appears in the record, he stated that he learned that the hospital had a significant problem with operating-room-acquired infection in April and May 1991. Likewise, in answer to interrogatories directed to him by the Campos, Dr. Correa stated that the hospital had an infection control problem that existed on or about April 10, 1991, and that the hospital's infection control problem contributed to or caused Campo's nosocomial infection (meningitis).
[13] As the hospital adroitly points out, Dr. Billings provided an affidavit for the record on September 29, 1999, that stated that at no time did he assert, explicitly or implicitly, to Campo that the hospital was negligent in providing medical care and treatment to Campo or that it had committed malpractice to Campo while he was a patient in the hospital. But see n. 12, supra.
[14] Deposition of Alvin Campo, June 8, 1999; page 25, lines 18-23.
[15] LA.REV.STAT. ANN. § 9:2794(C) provides, in pertinent part:

The jury shall be further instructed that injury alone does not raise a presumption of the physician's, dentist's, optometrist's, or chiropractic physician's negligence.
[16] Even the medical review panel recognized these as "recognized complications of the surgery."
[17] Compare Bossier v. Ramos, 29,766 (La.App. 2 Cir.1997), 698 So.2d 711, writ denied, 97-2583 (La.12/19/97), 706 So.2d 463, a case where the plaintiff's back pain continuously worsened for more than one year post-surgery. Because of this fact, he read his medical chart and learned that surgery had been performed at the wrong level of his back. In that light, the courts properly held that his claim was prescribed because he knew malpractice occurred and yet he waited more than a year after this discovery to file his complaint.