896 So.2d 1066 (2004)
Quincy STANSBURY
v.
Dr. Nick ACCARDO.
In re: Medical Review Panel Claim of Stansbury.
Nos. 2003 CA 2691, 2003 CA 2692.
Court of Appeal of Louisiana, First Circuit.
October 29, 2004.
Writ Denied February 4, 2005.
*1067 Edward J. Cloos, III, Covington, Counsel for Plaintiff/Appellant, Quincy Stansbury.
James R. Shelton, Tiffany B. Thornton, Lafayette, Counsel for Defendant/Appellee, Dr. Nick Accardo.
Rene J. Pfefferle, Baton Rouge, Counsel for Defendant/Appellee, Franklin Foundation Hospital.
Before: CARTER, C.J., PETTIGREW, and MCDONALD, JJ.
CARTER, C.J.
Quincy Stansbury, plaintiff/appellant, seeks review of the district court judgment sustaining peremptory exceptions objecting to Quincy's medical malpractice claims as prescribed, filed by defendants/appellees, Dr. Nick Accardo and Franklin Foundation Hospital. We amend the judgment and affirm the judgment as amended.

FACTS AND PROCEDURAL HISTORY
This suit arises out of medical treatment provided to Quincy, a mentally retarded adult, by Dr. Accardo on October 4, 1999. On that date, Dr. Accardo, an orthopedist, *1068 performed arthroscopic surgery on Quincy's right knee. It is undisputed that Dr. Accardo did not order an x-ray on Quincy's right knee before or after surgery. Quincy alleges Dr. Accardo was negligent in failing to order x-rays  x-rays that may have revealed an osteosarcoma tumor near Quincy's right knee. Quincy has not seen Dr. Accardo since attending two post-operative visits on October 11, 1999 and October 18, 1999.
On October 30, 1999, Quincy presented to the Franklin Foundation Hospital Emergency Department complaining of right knee pain, advising of his surgery earlier that month, and explaining he had fallen in the bath that morning. The emergency room physician obtained x-rays of the right knee, interpreting the films as showing no bony abnormality and only mild swelling. In contrast, Dr. Judith A. Kelsey, the radiologist who read Quincy's x-rays, stated in her report:
Additionally, there is a somewhat smudged appearance of the medial tibial metaphysis, the significance of which, is unclear. There may even be faint soft tissue calcification adjacent. Is there any clinical finding to suggest possible bone inflammation osteomyelitis)? Clinic correlation is advised. Radionuclide bone scan may be useful.
Dr. Kelsey's findings were not relayed to Quincy or to Dr. Accardo. Upon discharge from the emergency room, Quincy was advised to take over-the-counter pain medication, return to the emergency department for any problems, and to follow-up in a couple of days with Dr. Accardo. Quincy did not schedule an appointment with Dr. Accardo.
On December 31, 1999, Quincy, an epileptic, suffered a seizure at his home and was taken to Franklin Foundation Hospital Emergency Department. While there, Quincy complained of knee pain. The emergency room physician noted marked tenderness and some swelling of the right knee; x-rays were ordered. Dr. Kelsey again read the films. In her deposition, Dr. Kelsey stated that Quincy's condition had worsened since the earlier x-rays. In her report, she noted soft tissue calcification with bony involvement of the medial tibial plateau. Prominently written was the phrase, "PRIMARY NEOPLASM OF BONE TO BE EXCLUDED." Although Dr. Kelsey did not deliver her report directly to Quincy, she delineated the numerous steps she took to identify and notify Quincy's primary care physician of her troubling findings.
Most likely due to the diligence of Dr. Kelsey, on January 5, 2000, Quincy was admitted to Children's Hospital in New Orleans, Louisiana, and placed under the care of Dr. Stephen Heinrich. Upon arrival, Quincy and his mother, Viola Stansbury, delivered the October and December 1999 x-rays taken at Franklin Foundation Hospital. Dr. Heinrich immediately ordered an MRI, which revealed the presence of metastasized osteogenic sarcoma of the right knee. Quincy and his mother were advised and counseled relative to the cancer diagnosis and Quincy's treatment options. Chemotherapy was begun, and on June 12, 2000, Quincy's right leg was amputated above the knee.
In March of 2001, Quincy and his mother consulted with counsel. On August 29, 2001,[1] Quincy filed with the Louisiana Patient's Compensation Fund a Petition for Review of Medical Malpractice Claim against Dr. Accardo, alleging malpractice occurring in October of 1999. On November 8, 2002, the complaint was amended to name Franklin Foundation Hospital as an *1069 additional defendant, alleging malpractice occurring on October 30, 1999. Broadly stated, Quincy alleges the defendants' actions delayed the diagnosis of his osteosarcoma by sixty to ninety days, causing the loss of his leg and denying him the chance of long-term survival.
In response to the complaint, Dr. Accardo and Franklin Foundation Hospital filed peremptory exceptions raising the objection of prescription. Following a contradictory hearing, the district court ruled that Quincy's claims were prescribed; the exceptions to prescription were sustained. In written reasons, the district court concluded that, by June 12, 2000, the date Quincy's leg was amputated, at the latest, Quincy had constructive knowledge of his claims against Dr. Accardo and Franklin Foundation Hospital.

DISCUSSION
Louisiana Revised Statute 9:5628 A provides two prescriptive limits for bringing a medical malpractice action. An action may be brought one year from the date of the alleged act, omission, or neglect or within one year from the date of discovery of the alleged act, omission, or neglect, but not more than three years from the alleged act of malpractice. The provisions of the statute "shall apply to all persons whether or not infirm or under disability of any kind and including minors and interdicts." LSA-R.S. 9:5628 B.
As Quincy's malpractice claims were filed more than one year after the alleged acts of malpractice occurred, the central issue for this court to determine is the date that Quincy had actual or constructive knowledge of the alleged act, omission, or neglect sufficient to begin the running of the one year prescriptive period on his medical malpractice claim. In determining who bears the burden of proof on a peremptory exception raising the objection of prescription filed in response to a medical malpractice claim, one must determine whether the plaintiff made a prima facie showing that his claim was filed "within one year from the date of discovery" and "within a period of three years from the date of the alleged act, omission or neglect." LSA-R.S. 9:5628 A.
Quincy's August 31, 2001 claim against Dr. Accardo alleges Quincy became aware of the alleged substandard care by Dr. Accardo during the "compilation and review of his medical records during the year 2001." Although it is questionable that this broad statement asserts with particularity facts sufficient to establish a prima facie showing of timeliness, we conclude Quincy's petition is not prescribed on its face. So concluding, the burden of proof rests with Dr. Accardo to establish Quincy's action against him is prescribed. See Campo v. Correa, 01-2707 (La.6/21/02), 828 So.2d 502, 509.
In contrast, Quincy's November 8, 2002 malpractice claim against Franklin Foundation Hospital is based on activity occurring on October 30, 1999. As Quincy's malpractice claim against the hospital was filed more than three years after the date of the alleged act of malpractice, the claim is prescribed on its face; this shifts the burden of proof to Quincy to show that his action against the hospital is not prescribed. See Campo, 828 So.2d at 509 n. 10. Quincy can meet this burden only by proof that the hospital is solidarily liable with Dr. Accardo and that the claim against Dr. Accardo was timely filed. It is therefore appropriate for this court to first examine the timeliness of Quincy's claim against Dr. Accardo.
The discovery exception found in LSA-R.S. 9:5628 A is a codification of the discovery doctrine of contra non valentem. *1070 In re Medical Review Panel for Claim of Moses, 00-2643 (La.5/25/01), 788 So.2d 1173, 1178. Under the discovery doctrine, prescription does not begin to accrue until the plaintiff should have discovered he had a reasonable basis for pursuing a claim against the defendant. Moses, 788 So.2d at 1178 n. 10.
Likewise, the prescriptive period for a medical malpractice claim begins to run even if the injured party does not have actual knowledge of the facts that would entitle him to bring a suit, as long as there is constructive knowledge of same. Campo, 828 So.2d at 510. Constructive knowledge is notice sufficient enough to excite attention and put the injured party on guard and call for inquiry. Campo, 828 So.2d at 510-11. Whether a plaintiff had constructive knowledge of the existence of a medical malpractice cause of action at a particular time must be decided based on the particular facts of the case. See Wang v. Broussard, 96-2719 (La.App. 1 Cir. 2/20/98), 708 So.2d 487, 491, writ denied, 98-1166 (La.6/19/98), 720 So.2d 1213.
The court must evaluate the reasonableness of the plaintiff's action or inaction in light of the plaintiff's background, intelligence, and education. The court also should consider the gravity of the plaintiff's condition, as well as the plaintiff's response to his symptoms. Other relevant circumstances, such as the defendant's conduct, must be considered. See Campo, 828 So.2d at 502; Wang, 708 So.2d at 491. Whether a plaintiff's action or inaction was reasonable is a factual determination that an appellate court cannot disturb absent a finding of manifest error. See Landry v. Leonard J. Chabert Medical Center, 02-1559 (La.App. 1 Cir. 5/14/03), 858 So.2d 454, 462, writs denied, 03-1748 (La.10/17/03), 855 So.2d 761 and 03-1752 (La.10/17/03), 855 So.2d 761.
Quincy argues that in light of his diminished cognitive abilities, it was reasonable for him to not discover his cause of action until he consulted with an attorney in March of 2001. In support of this assertion, Quincy references the Louisiana Supreme Court decision in Campo. Therein, the supreme court concluded the date of discovery was not reasonably knowable by the plaintiff until a second doctor informed the plaintiff that the defendant doctor's use of a peritoneal shunt was improper. The supreme court's conclusion cannot be considered without reference to the facts. In Campo, the defendant doctor misled the plaintiff by advising him that his undesirable condition was a recognized complication of surgery. In contrast, Quincy makes no allegation that Dr. Accardo made misleading representations. Nor did Quincy maintain a continuing doctor-patient relationship with Dr. Accardo. Although the plaintiff's interaction with an attorney or physician is relevant to a determination of constructive knowledge, the jurisprudence is clear that it is not necessary that an attorney or physician inform a plaintiff of the existence of a medical malpractice cause of action before the prescriptive period can begin. Wang, 708 So.2d at 491. The court should consider all relevant circumstances in evaluating the reasonableness of a plaintiff's action or inaction.
Quincy was born June 11, 1981. He is mentally retarded with IQ scores lower than 99% of the populace. Dr. Matthew Thompson, accepted as an expert in neuropsychology, explained that Quincy thinks and acts like an eight- to ten-year-old child. These findings are consistent with those reported in the January 2000 Neuropsychology Consultation Report, prepared as part of the Children's Hospital work-up. The majority of his education was in special education classes; he graduated from a high school certificate program. *1071 The report concludes with a recommendation: "Information pertaining to Quincy's medical care should be explained in very simple terms and in the presence of his mother and family members."
The doctors and staff at Children's Hospital attempted to comply with this directive. When Dr. Stephen Heinrich, Quincy's primary treating physician at Children's Hospital, was asked if he felt he was able to successfully explain the medical situation to Quincy and his family in very simple terms, he responded, "I think so." Dr. Heinrich explained: "[T]here would have been quite a lot of discussion about what we thought and what we were going to do." Dr. Heinrich was asked:
Okay. Have you ever had any discussion with the patient or the patient's parents in regard to the knee surgery that had been performed or the absence of a diagnosis of osteosarcoma at the time of the knee surgery?
To which Dr. Heinrich responded:
Certainly there are some questions about his history, how he got there, what had occurred. One of the major concerns is that the placement of those arthroscopic portals probably seeded the joint with tumor, making my job if you are looking at a resection significantly more difficult; and certainly if you are talking to them about what you can technically do and not do, that has to be part of the discussion.
Quincy lives with his mother, and she was present at most doctor appointments and hospital stays. Dr. Heinrich testified her consent to treatment was necessary in light of Quincy's mental retardation. In light of her close relationship with her son, Mrs. Stansbury's understanding of the events is a relevant consideration. In her deposition, Mrs. Stansbury stated that after Quincy "took his last chemo," she told a friend that she was concerned about Quincy's life and would like to talk to someone.[2] That friend suggested Mrs. Stansbury speak with an attorney. Mrs. Stansbury explained: "Because Dr. Accardo's the one messed up his life. Now [Quincy's] got to live like this all the rest of his life .... he practiced on my child." When asked when she came to the conclusion that Dr. Accardo was responsible, Mrs. Stansbury replied: "When he first started going to Children's Hospital"  January of 2000.
As this court stated in Krolick v. State ex rel. Dept. of Health and Human Resources, 99-2622 (La.App. 1 Cir. 9/22/00), 790 So.2d 21, 28, writ denied, 00-3491 (La.2/9/01), 785 So.2d 829,: "[o]ne may not escape the commencement of prescription by attempting to establish that their ability to comprehend and evaluate the facts is inferior to that possessed by a reasonable man." In Krolick, this court found a schizophrenic had sufficient constructive knowledge to start the running of prescription against a former psychiatrist.

CONCLUSION
The district court concluded that by June 12, 2000  the date of the amputation of Quincy's leg  Quincy had sufficient notice to excite attention and to put him on inquiry that a negligent act or omission had occurred. We cannot say the district court's conclusion is manifestly erroneous. Inaction by Quincy within one year of June 12, 2000 was unreasonable in light of the relevant circumstances, including Quincy's limited intelligence and education, continuing symptoms, and intervening medical care. Following the surgery performed by Dr. Accardo, Quincy pursued medical *1072 treatment from other sources. Mrs. Stansbury and other family members accompanied Quincy as he sought a complete diagnosis and obtained necessary medical care. Moreover, there is nothing in the record to indicate the defendant, Dr. Accardo, interfered with Quincy's ability to discover the alleged malpractice. After two post-operative appointments, Quincy stopped seeing Dr. Accardo, despite express recommendations that he return to Dr. Accardo for follow-up care.
Having thoroughly reviewed the record, jurisprudence, and statutory authority, we reluctantly conclude that Quincy's actions against Dr. Accardo and Franklin Foundation Hospital are prescribed. We cannot ignore the clear dictates of the legislature  prescription runs against all persons whether or not infirm or under disability of any kind. LSA-R.S. 9:5628 B.
In reviewing the district court's judgment, we observe that although the exceptions raising the objection of prescription were sustained, the judgment does not dismiss Quincy's medical malpractice claims and related consolidated district court action. Louisiana Code of Civil Procedure article 934 specifies:
When the grounds of the objection pleaded by the peremptory exception may be removed by amendment of the petition, the judgment sustaining the exception shall order such amendment within the delay allowed by the court. If the grounds of the objection raised through the exception cannot be so removed, or if the plaintiff fails to comply with the order to amend, the action, claim, demand, issue, or theory shall be dismissed.
Because the objections raised through the defendants' exceptions cannot be removed by an amendment, the claims should have been dismissed. We amend the judgment of the trial court to dismiss the plaintiff's actions against Dr. Nick Accardo and Franklin Foundation Hospital with prejudice. Accordingly, the judgment appealed from, as amended, is affirmed. The costs of this appeal are assessed to the plaintiff/appellant, Quincy Stansbury.
JUDGMENT AMENDED; AFFIRMED AS AMENDED.
MCDONALD, J., concurs with reasons.
McDONALD, J. Concurring.
I do not think that La. R.S. 9:5628 B requires the result reached by the majority in this case. The question before us is not the dictates of the statute in prescribing against persons with a mental disability, but a question of what knowledge or constructive knowledge Quincy Stansbury had within the time frame provided by the legislature in which to file a medical malpractice claim. The statute does not include any directive in that determination.
Quincy's suit was filed more than one year after the date of the alleged malpractice by Dr. Accardo, but less than three years after that treatment. The case, in my opinion, fits squarely within the situation before the court in Campo v. Correa, although there are factual distinctions. The Supreme Court in Campo has determined that when adjudicating a case within these one year and three year time periods, "the ultimate issue is the reasonableness of the patient's action or inaction, in light of his education, intelligence, the severity of the symptoms and the nature of the defendant's conduct." Campo, 828 So.2d at 511.
The trial judge reviewed the depositions of Dr. Heinrich and Viola Stansbury, Quincy's mother, as well as the medical evidence and other evidence regarding Quincy's mental capabilities. Considering Quincy's education and intelligence, the judge determined that Quincy had enough *1073 constructive knowledge of Dr. Accardo's negligence by a specified date to conduct a further review or inquiry. Failure to do so in order that the suit could have been filed within a year of that date resulted in the action prescribing. This is a factual finding subject to review by this court under the clearly wrong/manifestly erroneous standard. I cannot say that the finding by the trial court is clearly wrong or manifestly erroneous. Therefore, I respectfully concur in the majority opinion.
NOTES
[1] In briefs, the filing date also is referred to as August 28, 2001.
[2] According to Mrs. Stansbury, Quincy had thirty-six weeks of chemotherapy. The evidence indicates Quincy's last treatment occurred in January of 2001.