DREW, J.
h Dorothy Rachal appeals the dismissal of her medical malpractice claim against Dr. Ravish Patwardhan on the granting of Dr. Patwardhan’s exception of prescription.
We affirm.
FACTS
Rachal, who has Alzheimer’s, began living at Garden Park Nursing Home in November of 2007. It was noted at the time that she had adequate memory and could make modified decisions.
Rachal was transported to Willis-Knigh-ton Pierremont Hospital on March 10, 2008, after she fell and exhibited symptoms of altered mental status. A CT scan of the brain showed a left-sided hemispheric subdural hematoma. Dr. Patwar- *1202 dhan performed a left craniotomy for evacuation of the hematoma on March 12, 2008.
Dr. Benjamin Nguyen was consulted two days later because Rachal remained confused and disoriented after the surgery. Dr. Nguyen noted that Rachal had a history of baseline dementia which appeared to be mild. His impression was aphasia that was probably due to the hematoma and which worsened with her underlying dementia.
After it was determined that Rachal had reached maximum medical benefit at Willis-Knighton, she was discharged on March 14, 2008, and transferred to Life-Care Hospital for continued treatment.
Rachal was discharged from LifeCare and returned to Garden Park on April 10, 2008. It was noted in her discharge summary that Rachal had some periods of confusion and some bad days, but the majority were good |adays. She had altered mental status shortly before being discharged, but a CT scan of the brain revealed no acute changes.
On December 22, 2010, Rachal submitted a request to the Division of Administration for the formation of a medical review panel to consider her claim that Dr. Patwardhan committed medical malpractice. Rachal alleged that Dr. Patwardhan’s surgery and his lack of postoperative care resulted in a dramatic worsening of Ra-chal’s memory. Rachal further alleged that it was not until September 20, 2010, that she learned that Dr. Patwardhan had been the subject of a disciplinary investigation by the Louisiana State Board of Medical Examiners (“LSBME”) resulting in an interim consent order that restricted his license and prevented him from performing neurosurgery. Rachal contended that she would not have allowed Dr. Pat-wardhan to perform the surgery had she known that he was not competent to perform neurosurgery in a safe and prudent manner.
Dr. Patwardhan filed an exception of prescription on May 29, 2013. A copy of Rachal’s malpractice claim, brief excerpts from her medical records, and two CDs containing her medical records[1] were introduced into evidence by Dr. Patwardhan at the hearing on the exceptions. Rachal introduced Dr. Patwardharis surgical report and the interim consent order into evidence at the hearing. The trial court granted the exception.
DISCUSSION
Rachal argues on appeal that her claim was timely filed because it | Swas filed within three years of the malpractice and within one year of her discovery of the interim consent order.
The prescriptive period for a medical malpractice claim is set forth in La. R.S. 9:5628(A):
No action for damages for injury or death against any physician ... whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect.
*1203 In order to soften the occasional harshness of prescriptive statutes, our courts have recognized a jurisprudential exception to prescription: contra non valentem agere nulla currit praescriptio, which means that prescription does not run against a person who could not bring his suit. Harvey v. Dixie Graphics, Inc., 593 So.2d 351 (La.1992). Contra non valentem in medical malpractice suits is embodied in ’ La. R.S. 9:5628. White v. West Carroll Hosp., Inc., 613 So.2d 150 (La.1992); Edwards v. Alexander, 42,000 (La.App.2d Cir.6/6/07), 960 So.2d 336.
The doctrine of contra non va-lentem acts as an exception to the general rules of prescription by suspending the running of prescription when the circumstances of the case fall into one of four categories. Prescription is suspended under the fourth category of contra non va-lentem when “some cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant.” Wimberly v. Gatch, 93-2361 (La.4/11/94), 635 So.2d 206, 211. Commonly known as the ^discovery rule, this category provides that prescription commences on the date the injured party discovers or should have discovered the facts upon which his cause of action is based. Id. For this category to apply, the plaintiffs ignorance of his cause of action cannot be attributable to his own willfulness or neglect, as a plaintiff is deemed to know what he could have learned by rear sonable diligence. Renfroe v. State ex rel. Dept, of Transp. and Development, 2001-1646 (La.2/26/02), 809 So.2d 947.
' [4,5] When a party has sufficient information to incite curiosity, or put a reasonably minded person on guard and call for inquiry, he has the constructive knowledge necessary to. start the running of prescription. Abbott v. Louisiana State Univ. Med. Ctr.-Shreveport, 35,693 (La. App.2d Cir.2/27/02), 811 So.2d 1107, writ denied, 2002-0952 (La.5/31/02), 817 So.2d 104; Cruse v. Louisiana State University Medical Center, 34,779 (La.App.2d Cir.6/20/01), 792 So.2d 798. When a plaintiff has knowledge of facts strongly suggestive that the untoward condition or result may be the result of improper treatment, and there is no effort by the health care provider to mislead or cover up information which is available to plaintiff through inquiry or professional medical or legal advice, then the cause of action is reasonably knowable to plaintiff. Failure to act by a plaintiff for more than one year under these circumstances is not reasonable. Abbott, supra; Harlan v. Roberts, 565 So.2d 482 (La.App. 2d Cir. 1990), writ denied, 567 So.2d 1126 (La. 1990).
The prescriptive period in medical malpractice claims will not begin to run at the earliest possible indication that a patient may have suffered |ssome -wrong. Abbott, supra; Guitreau v. Kucharchuk, 99-2570 (La.5/16/00), 763 So.2d 575. Rather, in order for the prescriptive period to commence, the plaintiff must be able to state a cause of action — both a wrongful act and resultant damages. Id. The law of prescription does not require that the patient be informed by a medical practitioner or an attorney of possible malpractice before the prescriptive period begins to run. Abbott, supra; Dixon v. Louisiana State Univ. ■ Med. Ctr., 33,036 (La.App.2d Cir.1/26/00), 750 So.2d 408, writ denied, 2000-0627 (La.4/20/00), 760 So.2d 350. -
The party raising the exception of prescription ordinarily bears the burden of proof at the trial of the peremptory exception. Spott v. Otis Elevator Co., 601 So.2d 1355 (La.1992). However, when prescription is evident from the face of the *1204 pleadings, the plaintiff bears the burden of showing the action has not prescribed. Id.
The malpractice claim was filed on December 22, 2010, more than one year after the March 12, 2008, date of the alleged act of malpractice. Rachal contended in her claim that the surgery, and Dr. Patwar-dhan’s lack of postoperative care since he never saw or treated her again following the surgery, caused a dramatic worsening of her memory. Rachal further contended in her malpractice claim that she learned on September 20, 2010, that Dr. Patwar-dhan was the subject of a disciplinary investigation by the LSBME, and that she would not have allowed him to perform the surgery had she known that he was not competent to do so in a safe and prudent manner.
|fiIn support of her position that her action is not prescribed on the face of her claim, Rachal references Campo v. Correa, 2001-2707 (La.6/21/02), 828 So.2d 502. In Campo, the supreme court stated:
[A] petition should not be found prescribed on its face if it is brought within one year of the date of discovery and facts alleged with particularity in the petition show that the patient was unaware of malpractice prior to the alleged date of discovery, and the delay in filing suit was not due to willful, negligent, or unreasonable action of the patient.
[The lower courts] erred as a matter of law when they found that the Campos’ petition was prescribed on its face. Although the Campos’ petition was filed more than one year after the date of the last act of the hospital and Dr. Correa’s last act upon which negligence was alleged, the plaintiffs pleadings made a prima facie showing that it was filed “within one year from the date of discovery” and “within a period of three years from the date of the alleged act, omission or neglect.” La.Rev.Stat. Ann. § 9:5628(A). Accordingly, the lower courts erred as a matter of law in shifting the burden to the Campos to prove prescription was interrupted. Therefore, we find that the burden of proof at the trial of the peremptory exception rested upon the hospital and Dr. Correa, the exceptors.
Footnotes omitted. Id., 2001-2707 at pp. 9-10, 828 So.2d at 509.
This court has concluded that the ruling on the burden of proof in Campo was dictum, and that Campo is distinguishable in a setting such as this when no petition has been filed in district court. Holmes v. LSU/E. A. Conway Med. Ctr., 43,662 (La. App.2d Cir.10/22/08), 997 So.2d 605. Citing Dixon v. Louisiana State Univ. Med. Ctr, supra, the court in Holmes noted that when met with an exception of prescription filed in district court during a pending medical panel review under the Medical Malpractice Act, the plaintiff is required to prove the defense of contra non valentem as allowed under La. R.S. 9:5628.
With the reasoning in Holmes in mind, we conclude that Rachal had |7the burden at the hearing on the exception to prove that her claim was not prescribed. We note that this case is different from Holmes in one respect. Neither party in Holmes presented any evidence concerning the alleged late discovery of the malpractice. The parties in this matter provided the court with significant facts surrounding Rachal’s discovery of the alleged malpractice.
A review of Rachal’s medical records show that by no later than the end of April 2008, she had constructive knowledge of facts indicating to a reasonable person that she may have been the victim of medical malpractice.
The resident activities record from Garden Park reflects that on April 14, 2008, *1205 Rachal was alert with confusion and made statements and asked questions that made no sense. It had been noted in this hospital record 12 days earlier that her daughter visited often.
Rachal returned to Willis-Knighton’s emergency room on April 18, 2008, with symptoms of confusion, decreased mental status, and decreased responsiveness. The symptoms, noticed by Rachal’s daughter, had gradually occurred the day before. It was noted that Rachal had been functioning at full capacity until the prior afternoon when she suddenly lost her level of consciousness and became difficult to arouse. A neurologist was consulted, and he determined that Rachal had a normal neurological exam. He did not find any new neurological deficits, and thought her symptoms could be related to regular day-to-day fluctuations that occur in dementia patients. Rachal’s daughter told the neurologist that she felt her mother had slowly gone downhill since the head injury. A CT scan showed 1 sencephalomalacia in the area of her head injury. Rachal was discharged to Garden Park on April 18 after returning to her normal level.
Rachal was next brought to Willis-Knighton on April 20, 2008. Increased confusion was one of her symptoms. She was discharged that same day.
Rachal returned to Willis-Knighton three days later because of altered mental status. Her daughter told the emergency room staff that her mother had been there a few days earlier for the same symptoms. Her doctors thought that the changes in her mental condition were probably related to her multiple medications. She was discharged to the nursing home on April 28 after she improved clinically. During this hospitalization, Dr. Nguyen examined her and noted that she was awake and alert and could answer simple questions and follow simple commands.
It was recorded in a social progress note at Garden Park on April 30, 2008, that Rachal had short-term memory loss. The fact that her daughter visited Rachal on a daily basis had been noted in the social progress notes a week earlier. Assuming this is the same daughter referenced in other dates in the medical records and who executed the consent form for the cranio-tomy, her frequent contact with her mother is significant as she was apparently involved in her mother’s healthcare and would have been in a position to recognize changes in her mother’s mental well-being.
Rachal maintains that the surgery and lack of postoperative care caused her mental state to worsen so that she was prevented from knowing of her claim within one year of the act of malpractice. However, La. R.S. |g9:5628(B) states that the “[t]he provisions of this Section shall apply to all persons whether or not infirm or under disability of any kind and including minors and interdicts.” Moreover, while Rachal’s overall mental status appeared to decline following the surgery, it also appeared that the extent of her mental shortcomings waxed and waned, at least initially on a regular basis.
Rachal further maintains that Dr. Pat-wardhan’s failure to comply with the appropriate standard of care is not limited to the traditional consideration of whether the rendition of care and treatment fell below the standard of care, but also includes whether he failed to obtained appropriate informed consent, as well as whether he lacked the degree of knowledge and skill ordinarily held by neurosurgeons, and that this lack of knowledge or skill resulted in damages.
Rachal argues that she filed her claim within one year of the discovery of the interim consent order that put her on notice that Dr. Patwardhan lacked the re *1206 quired knowledge, skill, and competency to perform neurosurgery. She continues that Dr. Patwardhan’s concealment and misrepresentation of his overall knowledge, skill, and competency triggered the third category of contra non valentón.
This third category is implicated only when (1) the defendant engages in conduct which rises to the level of concealment, misrepresentation, fraud or ill practice; (2) the defendant’s actions effectually prevented the plaintiff from pursuing a cause of action; and (3) the plaintiff must have been reasonable in his or her inaction. Marin v. Exxon Mobil Corp., 2009-23681 in(La.l0/19/10), 48 So.3d 234.
There is nothing in this record indicating that Dr. Patwardhan’s conduct rose to the level of concealment that prevented Rachal from availing herself of her cause of action. The consent order, which restricted Dr. Patwardhan to a nonsurgical practice, was not entered into until September 20, 2010, more than two years after the surgery. The LSBME was conducting an ongoing investigation of Dr. Patwar-dhan regarding alleged violations of the Louisiana Medical Practices Act. Dr. Pat-wardhan could escape the restriction by successfully completing an approved assessment, training, or course of study that demonstrated his ability to perform surgery with reasonable skill and safety. The order was merely a preliminary matter, as it stated:
While maintaining all such rights in the events formal charges are filed in these proceedings and without admitting any violation of the Act or the Board’s rules, Dr. Patwardhan, nonetheless, hereby consents to this Interim Consent Order indefinitely restricting his authority to perform surgery in this state.
The interim consent order would not have provided Rachal with any additional awareness two years later that she was the victim of medical malpractice as she had episodes of diminished mental status in April of 2008 that would have placed a reasonable person on guard that her undesirable condition may have been related to the surgery.
Rachal also maintains that Dr. Patwardhan failed to obtain informed consent because she would not have given consent to the surgery had she known of his lack of knowledge, skill, and competency as evidenced by the interim consent order.
| n Louisiana jurisprudence requires that a plaintiff in an action based on a failure to obtain informed consent prove the following four elements in order to prevail: (1) a material risk existed that was unknown to the patient; (2) the physician failed to disclose the risk; (3) the disclosure of the risk would have led a reasonable patient in the patient’s position to reject the medical procedure or choose another course of treatment; and (4) the patient suffered injury. Snider v. Louisiana Medical Mut. Ins. Co., 2013-0579 (La.12/10/13), 130 So.3d 922.
Written consent to medical treatment means the voluntary permission of a patient through designated means to any medical or surgical procedure or course of procedures which sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, or of disfiguring scars associated with such procedure or procedures. La. R.S. 40:1299.39.5(A).[2] The statute further states in section (D):
In a suit against a physician or other health care provider involving a health care liability or medical malpractice *1207 claim which is based on the failure of the physician or other health care provider to disclose or adequately to disclose the risks and hazards involved in the medical care or surgical procedure rendered by the physician or other health care provider, the only theory on which recovery may be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent.
Rachal’s daughter was presented with the risks of the craniotomy l^when she consented to her mother’s surgery. Any questions as to Dr. Patwardhan’s competency as a neurosurgeon raised two years later by the interim consent order are not a risk of death, brain damage, paralysis, loss of function, or disfigurement that is inherent in the procedure.
When evidence is introduced at the hearing on the peremptory exception of prescription, the district court’s findings of fact are reviewed under the manifest error — clearly wrong standard of review. Carter v. Haygood, 2004-0646 (La.1/19/05), 892 So.2d 1261.
Based upon this record, we find no manifest error in the judgment granting Dr. Patwardhan’s exception of prescription and dismissing Rachal’s action against him.

DECREE

At Rachal’s cost, the judgment is AFFIRMED.

. The medical records numbered over 4300 pages. The court remains mystified as to why Dr. Patwardhan felt it was necessary to introduce all this material. Surely more excerpts could have covered this issue. At the least, additional specific references to page numbers would have been appreciated.

. La. R.S. 40:1299.40 was amended and reenacted by Act 759, § 2, of 2012 to consist of *1207 La. R.S. 40:1299.39.5 to 40:1299.39.7. The general subject matter remained unchanged.