843 So.2d 584 (2003)
Stacy M. BAILEY, Individually and on Behalf of her Minor Child, Tyrell Jevon Manuel, Plaintiffs-Appellants,
v.
Dr. William Mark HAYNES, Defendant-Appellee.
No. 37,038-CA.
Court of Appeal of Louisiana, Second Circuit.
April 9, 2003.
*585 Guerriero & Guerriero, by Jeff D. Guerriero, for Appellants.
Rountree, Cox, Guin & Achee, by Gordon E. Rountree, New Orleans, for Appellee.
Before BROWN, STEWART and KOSTELKA (Pro Tempore), JJ.
KOSTELKA, Judge Pro Tempore.
Stacy Manuel Bailey ("Bailey"), individually and on behalf of her minor child, Tyrell Jevon Manuel ("Tyrell"), appeals the trial court's judgment granting the exception of prescription filed by Dr. William Mark Haynes ("Dr. Haynes"). For the following reasons, we affirm.

FACTS
On September 9, 1995, Bailey, who was forty-two weeks pregnant, was admitted to Homer Memorial Hospital. Bailey claims that on September 9, she was treated for possible latent labor with the diagnosis of intrauterine pregnancy. After a difficult delivery in which forceps were used, Tyrell was born at 8:52 a.m. At the time of his delivery, Tyrell was in very critical condition and was not breathing. He was hemorrhaging and having convulsions, of which Bailey was aware.
Dr. Haynes arranged for Tyrell to be transferred and transported to Schumpert Medical Center ("Schumpert") in Shreveport, Louisiana. At Schumpert, Tyrell, still in critical condition, was initially treated by Dr. Julia Elrod ("Dr. Elrod"), a neonatologist. On arriving at Schumpert, Tyrell still was not breathing properly, was intubated and placed on a ventilator. He was also having seizures. The Schumpert medical team worked to stop the seizures, but Tyrell remained on the ventilator for several days. After removal of the ventilator, he remained on oxygen for several more days.
Bailey was advised by Dr. Michael Cone ("Dr. Cone"), also a neonatologist, that Tyrell had a potential for abnormal neurological development. According to Dr. Cone's notes, Bailey understood, and he answered all of her questions. Dr. Haynes further states that Dr. Cone spoke *586 subsequently with Bailey and advised her that Tyrell had a potential for mental retardation and cerebral palsy. Again, Dr. Cone's case notes indicate that Bailey understood his explanation. Tyrell was eventually discharged from Schumpert on September 26, 1995 and was then on phenobarbital for his seizures. At one point in time, Tyrell's phenobarbital prescription was not filled, resulting in a severe seizure for which he was hospitalized for three days.
Bailey filed her complaint with the Patients' Compensation Fund on July 15, 1997, one year and ten months after Tyrell's birth. After an unfavorable decision, Bailey filed suit against Dr. Haynes, to which Dr. Haynes filed his Exception of Prescription, claiming that Bailey's petition had been filed more than one year after the date of alleged malpractice and knowledge thereof. The Exception of Prescription was granted by the trial court. This appeal ensued, in which Bailey argues that the trial court erred in its interpretation of La. R.S. 9:5628 and in granting Dr. Haynes' Exception of Prescription. For the following reasons, we affirm.

DISCUSSION
On the trial of a peremptory exception pleaded prior to trial of the case, evidence may be introduced to support or controvert any of the objections pleaded when the grounds thereof do not appear from the petition. La. C.C.P. art. 931. When evidence has been introduced, the court is not authorized to accept the plaintiff's allegations as true. Schoen v. Walling, 31,598 (La.App.2d Cir.02/24/99), 728 So.2d 982. When evidence is received on the trial of the peremptory exception, as was done in the case sub judice, the factual conclusions of the trial court are reviewed by the appellate court under the manifest error-clearly wrong standard as articulated in Stobart v. State Through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). Creighton v. Bryant, 34,893 (La.App.2d Cir.06/20/01), 793 So.2d 275.
Specifically, regarding the liberative prescription of a malpractice claim, La. R.S. 9:5628 states in pertinent part, as follows:
A. No action for damages for injury or death against any physician, ... duly licensed under the laws of this state, ... whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect.
The one-year prescriptive period commences running on the date in which the injured party discovers or should have discovered the facts upon which his cause of action is based. Maung-u v. May, 556 So.2d 221 (La.App. 2d Cir.1990), writ denied, 559 So.2d 1385 (La.1990). When a party has sufficient information to incite curiosity, to excite attention, or to put a reasonably minded person on guard and call for inquiry, he or she has the constructive knowledge necessary to start the running of prescription. Cruse v. Louisiana State University Medical Center, 34,779 (La.App.2d Cir. 06/20/01), 792 So.2d 798; LaGrange v. Schumpert Medical Center, 33,541 (La.App.2d Cir.06/21/00), 765 So.2d 473.
As to claims of prescription generally, the party claiming prescription bears the burden of proof at the trial of *587 the peremptory exception. However, if prescription is evident on the face of the pleadings, then the burden shifts to the plaintiff to show that the action has not prescribed. Nolan v. Roofing Supply, Inc., 36,403 (La.App.2d Cir.11/26/02), 833 So.2d 1026, citing, Campo v. Correa, 2001-2707 (La.06/21/02), 828 So.2d 502.
Here, Bailey claims that she was unaware that Tyrell was developmentally delayed until a diagnostic developmental test performed on September 11, 1996 showed an abnormal result. She maintains that this was the first time she became aware that Tyrell had a medical problem which may have been the result of medical malpractice. However, the trial court assessed the evidence before it and concluded that Bailey had knowledge from the date of Tyrell's birth that he was not normal. Such a finding by the trial court was not in error.
Bailey understood at the time of Tyrell's birth that the delivery was unduly difficult, a delivery for which she was fully alert and had received no medication. Bailey was also aware immediately after Tyrell's delivery that there were medical complications with the infant, and she specifically recalled that he "wasn't responsive," "hemorrhaging," and "having convulsions." She also knew that during the delivery "they got real concerned," the baby's head was "swollen pretty big," his eyes were swollen, and his condition necessitated that he be quickly transported to Schumpert.
At Schumpert, Tyrell was cared for by Drs. Elrod and Cone and also Dr. James Kim, a pediatric neurologist. Dr. Cone's progress notes dated September 12, 1995 state that he "... spoke with [Bailey] at length by phone; discussed decreasing seizure activity and potential for abnormal neurologic development secondary to this; also discussed concerns of kidneys and urine output; mother understood and all questions answered." Dr. Cone's progress notes from September 17, 1995 state: "[S]poke [with] mother at length by phone yesterday; condition updated, once again described symptomatology in detail; current findings, also explained potential for severe neurologic sequelae i.e. [mental retardation], [cerebral palsy] etc. should current condition continue. [Bailey] understood, all questions answered." Dr. Cone again discussed Tyrell's condition with Bailey, noting on September 22, 1995 that he "... cautioned potential for [questionable] long term neurological [abnormality]...." On September 26, 1995, Tyrell was finally discharged from Schumpert with a prescription of phenobarbital for his seizures and with instructions for follow-up medical care.
In the intervening year, Bailey noticed that Tyrell was not developing normally. Specifically, when Tyrell was four to five months old, Bailey questioned whether his head or brain was developing properly.[1] When Tyrell was seven or eight months old, Bailey noticed that he was not sitting up or crawling, which she considered unusual.
Tyrell was later assessed by Vicki Leach ("Leach"), a physical therapist at Schumpert, on July 18, 1996.[2] In her report, *588 Leach noted that Bailey was present to report on Tyrell's medical history for the evaluation. Leach noted Tyrell's medical history of neonatal seizures and his prescription of phenobarbital. Leach's report also included Bailey's wish that Tyrell "be able to reach his maximum potential." In her final assessment, Leach reported that:
Tyrell is a 10½ month old young boy with a diagnosis of cerebral palsy. Tyrell presents with overall gross motor delays as he is only performing activities in the two month level with some emerging skills in the three month level.... Tyrell definitely presents with overall developmental delays.... Tyrell's mother would like for Tyrell to receive therapy, ..."
Bailey contends that she did not discover the alleged act of Dr. Haynes' malpractice until the September 11, 1996 diagnosis of Tyrell; however, on the date of Tyrell's delivery, Bailey obviously had enough information to incite her curiosity as to his medical condition. At the least, she should have been well aware when Tyrell was discharged from Schumpert on September 26, 1995 that he had neurological abnormalities. Additionally, there is no indication that Bailey was ever misled regarding Tyrell's medical condition, as the medical reports regularly note that she was so informed.
Considering the facts of this particular case, we cannot say that Bailey was reasonable in failing to bring her action within one year from Tyrell's birth. She understood the difficulty in her delivery of Tyrell and his critical condition immediately following the birth, which should have put Bailey on guard to question her medical treatment and that of Tyrell. In fact, Tyrell was hospitalized for fifteen days following his birth. Bailey's alleged cause of action and the facts surrounding Tyrell's medical condition were readily known by Bailey immediately after his birth or, at the least, shortly thereafter, and clearly more than one year prior to filing her complaint with the Patients' Compensation Fund. The trial court did not commit manifest error in so finding.

CONCLUSION
Therefore, the judgment of the trial court sustaining the Exception of Prescription filed by Dr. William Mark Haynes is affirmed. Costs are assessed to Stacy M. Bailey.
AFFIRMED.
NOTES
[1] In deposition, Bailey testified that she questioned whether Tyrell's brain was developing normally. However, at the hearing on Dr. Haynes' Exception of Prescription, Bailey modified her testimony and explained that she actually questioned whether the shape of his head was normal at the time, and not his brain.
[2] This report by Leach was within one year of Bailey's complaint with the Patients' Compensation Fund; however, even with the explicit statements by Leach regarding Tyrell's condition, Bailey still claims that it was not until September 11, 1996 that she became aware Tyrell had significant medical problems. Leach's report clearly shows that Bailey had knowledge of Tyrell's condition prior to September 11, 1996, and seriously calls into question Bailey's claim that it was not until that date that she was truly aware of Tyrell's diagnosis.