STEWART, J.
Lin this medical malpractice action, the trial court dismissed the claims of the plaintiff, Joe L. Davidson, Sr. (“Mr. Davidson”), upon granting exceptions of prescription filed on behalf of the defendants, Glenwood Resolution Authority, Inc., f/k/a Glenwood Regional Medical Center (“Glen-wood”) and Robert Keith White, M.D. (“Dr. White”). Mr. Davidson now appeals. Finding no error in the trial court’s judgment, we affirm.
FACTS
On April 6, 2006, Dr. White performed surgery on Mr. Davidson at Glenwood to repair an abdominal aortic aneurysm. A piece of a Bookwalter retractor used during the surgery was inadvertently left in Mr. Davidson’s abdominal cavity. On March 27, 2009, Mr. Davidson filed a complaint with the Patient’s Compensation Fund, and on April 24, 2009, he filed his original petition against Glenwood. In both filings, Mr. Davidson alleged that he did not discover the presence of a foreign metal object in his abdominal cavity until April 24, 2008, when an MRI he was undergoing for an unrelated condition had to be stopped because of the metal object. In a supplemental petition filed on October 4, 2011, Mr. Davidson added Dr. White as a defendant and alleged that a CT scan done on October 28, 2008, confirmed that the metal object was part of the retractor used during the abdominal surgery performed by Dr. White.
Glenwood and Dr. White filed peremptory exceptions of prescription. They asserted that Mr. Davidson had knowledge of the metal object in his body as early as July 12, 2006, and no later than September 2006, that this | ^knowledge sufficed to begin the running of prescription, and that Mr. Davidson’s malpractice claim filed in 2009 was untimely.
In opposition to the exceptions, Mr. Davidson asserted that he did not learn that the metal object was a piece of the retractor used in the abdominal surgery performed by Dr. White at Glenwood until November 16, 2008, when Dr. William Ferguson (“Dr. Ferguson”) informed him of the results of the CT scan done in October 2008. Mr. Davidson claimed that prior to November 16, 2008, the doctors who examined him and performed tests believed the object to be part of a penile implant. Therefore, Mr. Davidson asserted that his complaint was filed within one year of discovery and within three years of the act of malpractice in accordance with La. R.S. 9:5628.
The trial court heard the exceptions on January 25, 2012. Dr. White testified, and the parties offered exhibits into evidence. In addition to the facts already mentioned, the evidence established that Mr. Davidson had undergone a second surgery on July 3, 2006, when Dr. Gerard Henry (“Dr. Henry”) removed a penile prosthesis that was causing medical problems. According to Dr. Henry’s deposition, he removed the entire three-piece implant.
On July 12, 2006, Mr. Davidson felt a “square corner” in his abdomen. He stated in his deposition that he knew “there was something there that [he] didn’t think should be there.” So, he went to Dr. Mark Dollar (“Dr. Dollar”), who ordered a *348 scrotal sonogram that was negative for a ^foreign body. Mr. Davidson did not recall the specifics of his conversation with Dr. Dollar.
On August 15, 2006, Mr. Davidson was treated at Glenwood’s emergency room (“ER”) following an automobile accident. A CT scan revealed a metallic structure in Mr. Davidson’s pelvis. Dr. Warren Green (“Dr. Green”), the radiologist, noted in his report that the object “may be related to the patient’s prosthesis.” Dr. Charles Blackmon (“Dr. Blackmon”), the ER physician who treated Mr. Davidson,, first stated in his deposition that he was not sure whether he discussed Dr. Green’s finding with Mr. Davidson. He then stated that he did talk to him about the object, told him he did not know what it was, and advised him to follow up with his physician. Mr. Davidson did not recall this discussion with Dr. Blackmon.
Dr. Green stated in his deposition that he contacted Dr. White about the finding because he was concerned whether Mr. Davidson had given an erroneous history about his penile implant being removed and he believed that Dr. White had operated on Mr. Davidson three weeks prior for the aortic aneurysm. Dr. Green stated that he and Dr. White looked at the film together and could not determine what the object was. However, Dr. Green stated that Dr. White was “fairly certain that it wasn’t part of a penile prosthesis.” Dr. Green never spoke with Mr. Davidson.
Dr. 'White, the only witness to testify before the trial court, stated that he contacted Mr. Davidson within 24 to 48 hours after speaking with Dr. Green about the object shown on the CT scan. He explained to Mr. Davidson that the scan showed a metal object in the pelvis near the rectum |4and that because it refracts he could not see the details. He told Mr. Davidson that he was concerned that it could be related to the surgery he performed. According to Dr. White, Mr. Davidson stated that he felt fine and did not want anything done about it. Dr. White also testified that he then saw Mr. Davidson on a couple of occasions at Glen-wood’s wellness center while swimming and asked him to come to this office to talk.
Mr. Davidson stated in his deposition that he did not recall speaking with Dr. White in September 2006 about a foreign object in his body. However, he did remember that Dr. White called his house after the MRI incident in April 2008 and stated this was his “second attempt.” He recalled that Dr. White asked if he was having any pain and advised him to leave it alone if not. Mr. Davidson also recalled seeing Dr. White a time or two at the wellness center, but he stated that he “would never infringe on his [Dr. White’s] rights by talking about medical things.”
An x-ray ordered by Dr. D.J. Donald in late September 2006 while treating Mr. Davidson for back pain also showed a metal object. Dr. Donald stated in his deposition that he told Mr. Davidson that the X-ray showed something that he believed to be the penile implant. They did not discuss it further. Mr. Davidson stated in his deposition that he did not recall any discussion with Dr. Donald about the metal object.
After the hearing, the trial court granted the exceptions of prescription. In its oral reasons for judgment, the trial court found Dr. White to be “very credible.” Based on Dr. White’s testimony, the trial court concluded that Mr. Davidson had sufficient notice sometime in the zone of IsAugust 15 to September 18, 2006, to begin the running of the prescriptive period. The claims against Glenwood and Dr. White were prescribed when Mr. Davidson *349 first filed his complaint with the Patient Compensation Fund in March 2009.
Mr. Davidson now appeals the judgment that granted the exceptions and dismissed his claims.
DISCUSSION
Mr. Davidson assigns two errors for our review. First, he asserts that the trial court made an error of law by applying the wrong legal standard for determining when prescription began. He argues that this legal error requires a de novo review of the record on appeal. Second, he asserts that the trial court was manifestly erroneous in its factual determination as to when he had notice sufficient to start the running of the prescriptive period.
The prescriptive periods for medical malpractice actions are provided by La. R.S. 9:5628(A), which states:
A. No action for damages for injury or death against any physician, chiropractor, nurse, licensed midwife practitioner, dentist, psychologist, optometrist, hospital or nursing home duly licensed under the laws of this state, or community blood center or tissue bank as defined in R.S. 40:1299.41(A), whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect.
Prescription begins when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is a victim of a tort. Campo v. Correa, 2001-2707 (La.6/21/02), 828 So.2d 502; White v. Willis-Knighton Medical Center, 632 So.2d 1198 (La.App. 2d Cir.1994), writ denied, 638 So.2d 1098 (La.1994). The supreme court in Campo, supra, explained what constitutes constructive knowledge as follows:
Constructive knowledge is whatever is enough to excite attention and put the injured party on guard and call for inquiry. Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead. Such information or knowledge as ought to reasonably put the alleged victim on inquiry is sufficient to start the running of prescription. Nevertheless, a plaintiffs mere apprehension that something may be wrong is insufficient to commence the running of prescription unless the plaintiff knew or should have known through the exercise of reasonable diligence that his problem may have been caused by acts of malpractice. Even if a malpractice victim is aware that .an undesirable condition has developed after the medical treatment, prescription-will not run as long as it was reasonable for the plaintiff not to recognize that the condition might be treatment related. The ultimate issue is the reasonableness of the patient’s action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant’s conduct.
Id., 2001-2707, p. 12, 828 So.2d at 510-511, citations omitted.
Prescription does not begin to run at the earliest possible indication that a patient may have suffered some wrong. Guitreau v. Kucharchuk, 1999-2570 (La.5/16/00), 763 So.2d 575, citing Jordan v. Employee Transfer Corp., 509 So.2d 420 (La.1987). A plaintiff is not required to rush to file suit against every person who may have caused him damage. A plaintiff *350 must be able to state a cause of action, including both a wrongful act and resultant damages. Guitreau, supra. However, “[ijgnorance of the actual extent of injuries differs from ignorance of actual harm, which delays commencement of prescription.” Id., p. 6-7, 763 So.2d at 580.
17With these principles in mind, we consider Mr. Davidson’s argument that the trial court erred as a matter of law by applying incorrect standards in assessing when he had the requisite knowledge to begin the running of prescription. Mr. Davidson asserts that the trial court’s references to the “time zone” when he, Mr. Davidson, should have known “something was amiss of a nature that would put him on notice sufficient enough” to begin prescription shows that the court applied an incomplete definition of constructive notice from Cartwright v. Chrysler Corp., 255 La. 597, 232 So.2d 285 (La.1970). Referring to constructive notice, Cartwright explained that whatever is “enough to excite attention and put the owner on his guard and call for inquiry is tantamount to knowledge or notice of everything to which inquiry may lead.” Mr. Davidson correctly states that the supreme court in Jordan, supra, referred to the Cartwright language as an “incomplete definition” of the kind of notice required to start prescription. The Jordan court explained that prescription does not begin at the earliest possible indication that some wrong has been suffered and should not be used to force a person to rush to file suit against all persons who might have caused damage. Id. Mr. Davidson asserts that he did not discover, and that it was not reasonable for him to have discovered, that he had a cause of action against Dr. White and Glenwood until he learned from Dr. Ferguson on November 16, 2008, that the piece of metal was from the retractor used during the surgery to repair his abdominal aortic aneurysm. He maintains that by applying the wrong legal standard, the trial court made a clearly | ¿wrong factual determination as to when he possessed knowledge of his cause of action sufficient to begin prescription.
After carefully reviewing the record and considering the arguments on behalf of Mr. Davidson, we find no error of law by the trial court. Appellate courts review judgments, not reasons for judgment. Wooley v. Lucksinger, 2009-0571 (La.4/1/11), 61 So.3d 507; Bellard v. American Cent. Ins. Co., 2007-1335 (La.4/18/08), 980 So.2d 654. Even so, the language referred to by Mr. Davidson in the trial court’s oral reasoning and the arguments put forth do not demonstrate that the trial court relied on an incorrect or incomplete definition of constructive notice to determine when Mr. Davidson had the requisite knowledge to begin the running of prescription. Based on the evidence presented by both parties, the trial court made a factual determination as to when Mr. Davidson had knowledge of facts indicating that he was a victim of a tort. In doing so, the trial court rejected Mr. Davidson’s contention about when he discovered the alleged malpractice.
When evidence is introduced at the trial of a peremptory exception, the trial court’s factual conclusions are reviewed under the manifest error or clearly wrong standard articulated in Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993). Carter v. Haygood, 2004-0646 (La.1/19/05), 892 So.2d 1261; Bailey v. Haynes, 37,038 (La.App.2d Cir.4/9/03), 843 So.2d 584, writ denied, 2003-1209 (La.10/10/03), 856 So.2d 1207. If the trial court’s findings are reasonable in light of the record reviewed in its entirety, then this court may not reverse even though convinced that as trier of fact |9we would *351 have weighed the evidence differently. Stobart, supra; Carter; supra.
The evidence established that as early as July 12, 2006, Mr. Davidson could feel a “square corner” in his abdomen and knew there was something that should not be there. He saw Dr. Dollar, his primary physician, but the test ordered by Dr. Dollar did not find anything. On August 15, 2006, the CT scan taken after his automobile accident revealed the presence of the metal object. Dr. Blackmon, the ER physician, indicated that he advised Mr. Davidson to follow up with his physician about it. Dr. Green, the radiologist, who first noted the presence of the metal object on the CT scan, contacted Dr. White. According to Dr. White’s testimony, he then contacted Mr. Davidson. Also, in September 2006, Dr. Donald noted the presence of the metal object on an X-ray taken while treating Mr. Davidson for back pain. He told Mr. Davidson about it and that be believed it was probably his penile implant. We note that at this time, Mr. Davidson knew that his penile implant had been removed and, according to Dr. White, had been informed that the object could be related to the abdominal surgery. In his deposition, Mr. Davidson generally claimed not to recall the discussions about the metal object with either Dr. Blackmon, Dr. Donald, or Dr. White.
The trial court specifically found Dr. White, who testified at the hearing, to be “very credible.” Dr. White testified that he called Mr. Davidson after being contacted by Dr. Green about the CT scan on August 15, 2006. Dr. White did not give an exact date but believed that he spoke with Mr. Davidson within 24 to 48 hours of going over the scan with Dr. |10Green. According to Dr. White, he told Mr. Davidson that the scan showed a metal object in his pelvis near the rectum and that he was concerned it could be related to the surgery he performed. He wanted Mr. Davidson to come to his office for additional tests to identify the object. Mr. Davidson refused, saying that he felt fine and did not want anything done. Dr. White also claimed that he asked Mr. Davidson to come to his office on a couple of occasions when he saw him at a wellness center. Though Mr. Davidson had no recollection of the conversation related by Dr. White, he did admit in his deposition that Dr. White called him after the MRI incident and stated that this was his “second attempt.” Mr. Davidson’s deposition also included a reference to his cell phone records showing a call from Dr. White’s office to Mr. Davidson’s cell phone and a return call on September 20, 2006.
Based on Dr. White’s testimony and the other evidence presented, it was reasonable for the trial court to conclude that Mr. Davidson had constructive, if not actual, notice shortly after August 15, 2006, that there was a metal object in his abdominal cavity and that it was likely related to the surgery performed by Dr. White on April 6, 2006. The fact that Mr. Davidson felt a square corner in his abdomen as early as July 12, 2006, coupled with the CT scan of August 15, 2006, which showed the presence of a metal object and Dr. White’s call soon thereafter about it possibly being related to his surgery, constitutes notice enough to excite attention and put an injured party on guard and call for inquiry.
At that time, Mr. Davidson was in his early seventies. He had operated a large farming business, and he had some college education. I^Though he apparently was not suffering from the presence of the metal object in his abdomen, he knew there was something that should not be there. Even discounting Dr. White’s testimony, both Dr. Blackmon and Dr. Donald stated in their depositions that they mentioned to Mr. Davidson the metal object *352 shown on their respective scans. This occurred in August and September of 2008 and would have given Mr. Davidson knowledge of the actual harm suffered as a result of an act of malpractice. The presence of a foreign metallic object in the abdominal cavity is not a natural occurrence; it is likely there as a result of some negligent oversight. Mr. Davidson had two surgeries in a relatively short period of time — the surgery by Dr. White on April 6, 2006, and the surgery by Dr. Henry on July 3, 2006, to remove the infected penile implant. Dr. Henry’s deposition relates that he saw Mr. Davidson on September 1, 2006, and on June 25, 2007, yet Mr. Davidson did not mention anything to him about the metal object or feeling something in his abdomen that shouldn’t be there. Had he inquired, he would have learned from Dr. Henry that the only metal in the implant was two small pieces of titanium in the pump, which had been removed. Mr. Davidson also refused to follow up with Dr. White. This is a case where reasonable inquiry and the exercise of reasonable diligence would have led to the discovery the alleged malpractice.
The law does not require that a plaintiff be informed of possible malpractice by an attorney or medical practitioner before prescription begins to run. Heirs of Jackson v. O’Donovan, 44,314 (La.App.2d Cir.5/13/09), 12 So.3d 435. Yet, this is exactly what would be required under Mr. | ^Davidson’s argument. Finding that Mr. Davidson did not learn that he had a claim against Dr. White and Glenwood until informed by Dr. Ferguson that the piece of metal was from the re-tractor used during the surgery by Dr. White would require this court to ignore the law on constructive notice and the evidence adduced at trial of the exceptions.
We find no manifest error in the trial court’s judgment. The defendants proved that Mr. Davidson’s claims against them were prescribed when filed more than one year from when he would have had actual or constructive notice sufficient to begin the prescriptive period.
CONCLUSION
For the reasons stated, we affirm the trial court’s judgment granting the defendants’ exceptions of prescription and dismissing with prejudice the claims of the plaintiff. The plaintiff is to bear the costs of appeal.
AFFIRMED.