NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2021 CA 1468
2021 CW 1109

JENNIFER THERIOT

VERSUS

PHYSICIANS MEDICAL CENTER, LLC AND XYZ INSURANCE COMPANY

Judgment Rendered: __OCT 2 7 2022__

* * * * * * *

On Appeal from the 32nd Judicial District Court
In and for the Parish of Terrebonne
State of Louisiana
Trial Court No. 180987

Honorable Juan W. Pickett, Judge Presiding

* * * * * * *

Gerald Wasserman
Leonard M. Berins
Metairie, Louisiana

Counsel for Plaintiff/Appellant,
Jennifer Theriot

Thomas C. Cowan
Lydia Habliston Toso
Metairie, Louisiana

Counsel for Defendant/Appellee,
Physicians Medical Center, LLC

John D. Schoonenberg
Nicholas Gachassin, III
Barry J. Boudreaux
Lafayette, Louisiana

Counsel for Defendant/Appellee,
Frederick Rau, M.D.

* * * * * * *

BEFORE: WHIPPLE, C.J., PENZATO, AND HESTER, JJ.

**PENZATO, J.**

In this medical malpractice case, plaintiff/appellant, Jennifer Theriot, appeals a judgment granting exceptions of prescription on the sole issue of informed consent and dismissing her claims against defendants/appellees, Dr. Frederick Rau and Physicians Medical Center, LLC ("PMC"), on the issue of informed consent with prejudice. In an associated writ, PMC seeks review of a judgment denying its motion for summary judgment and denying in full its exception of prescription. For the reasons that follow, we reverse the judgment granting the exceptions of prescription and dismissing Ms. Theriot's informed consent claims, and deny PMC's application for supervisory writs.

## FACTS AND PROCEDURAL HISTORY

In July of 2015, Ms. Theriot's primary care physician, Dr. Richard Haydel, referred Ms. Theriot to PMC for a thyroid ultrasound. The thyroid ultrasound report indicated a solid nodule in the lower pole of the left lobe. On July 29, 2015, Dr. Haydel called Ms. Theriot and recommended a biopsy of the thyroid nodule based on the results of the ultrasound. Ms. Theriot selected Dr. Rau, a general surgeon, from her insurance company's provider directory, and Dr. Haydel sent a referral for a biopsy to Dr. Rau.

Following a July 30, 2015 consultation with Dr. Rau, surgery was scheduled for August 11, 2015. Ms. Theriot alleged that this consultation lasted approximately five minutes, and Dr. Rau did not discuss with her any surgery, possible complications, and/or alternatives, including medication. Ms. Theriot assumed that Dr. Rau was performing a biopsy, the procedure recommended by Dr. Haydel.

On August 11, 2015, Ms. Theriot was admitted to PMC. She was accompanied by her sister, Victoria Cantrelle. After she was brought to the surgery area and was already administered anesthesia, it was determined that Ms. Theriot

2

had not signed the proper consent forms. A PMC employee asked Ms. Cantrelle, who had no authority to do so, to sign a consent form on behalf of Ms. Theriot, which she did. On August 11, 2015, Dr. Rau performed a total thyroidectomy.

Post-operatively, Ms. Theriot experienced hoarseness. She complained of hoarseness at follow-up visits with Dr. Rau, and according to Ms. Theriot, Dr. Rau reassured her that he did everything correctly and that it would take time for her voice to recover. On August 5, 2016, Dr. Rau performed an esophagogastroscopy at PMC and examined Ms. Theriot's vocal cords. According to Dr. Rau's operative note, "[t]here did not appear to be any atrophy or paralysis of the cord at all on exam."

Following the esophagogastroscopy, Ms. Theriot saw Dr. Haydel because of her continuing shortness of breath and throat pain. Dr. Haydel referred Ms. Theriot to Dr. Chad Simon, ENT. On August 24, 2016, Dr. Simon performed a fiberoptic laryngoscopy, after which he advised Ms. Theriot that she had left-sided vocal cord paralysis and surgery would be required. Dr. Simon referred Ms. Theriot to Dr. Andrew McWhorter, ENT, who performed a rigid laryngoscopy and videostroboscopy. Dr. McWhorter diagnosed Ms. Theriot with the following: dysphagia, oropharyngeal phase; dysphonia; unilateral partial paralysis of vocal cords or larynx; dyspnea, unspecified type; and irritation of palate. Ms. Theriot underwent surgery on February 27, 2017, to repair her paralyzed vocal cords.

On July 19, 2017, Ms. Theriot requested the formation of a Medical Review Panel ("MRP"), naming Dr. Rau and PMC as defendants. By letter dated September 5, 2017, Ms. Theriot was advised that PMC was not a qualified health care provider. She then filed a petition for damages against PMC on September 22, 2017, alleging that PMC "was responsible for the acts of its employees and physicians that violated the standard of care by allowing Patient Consent Forms to be executed by a patient without providing any explanation by a medical

3

professional of the risks of anesthesia and/or surgery."

On May 14, 2019, the MRP issued its opinion concerning Ms. Theriot's claims, finding there was a question of fact as to the pre-operative discussions between Dr. Rau and the patient regarding treatment options and the material risks of a biopsy or thyroidectomy; as there was no pre-operative signed written consent by Ms. Theriot, the adequacy of verbal consent was a question of fact bearing on liability.

On June 24, 2019, Ms. Theriot filed a supplemental and amending petition for damages, adding Dr. Rau as a defendant. In her petition, Ms. Theriot alleged that Dr. Rau was indebted "jointly, severally and *in solido*" with PMC for his failure to comply with the appropriate standard of care. She alleged that Dr. Rau failed to conduct proper testing to confirm the need for a thyroidectomy. She further alleged that PMC's pre-op checklist documented the failure of Dr. Rau and PMC's personnel to abide by the pre-procedure verification process prior to surgery, and that Dr. Rau and PMC were placed on notice that the proper consent forms were never signed prior to Ms. Theriot's surgery. Ms. Theriot alleged that prior to the August 11, 2015 surgery, she never had any problems with hoarseness and/or breathing, but after the surgery she immediately experienced hoarseness and had difficulty breathing; she saw Dr. Rau for follow-up care and was reassured by him each time that he did everything correctly and that it would take some time for her voice to get better. Ms. Theriot further alleged that at no time prior to her appointment with Dr. Simon on August 4, 2016, had she ever been told that her vocal cords were paralyzed.

On April 19, 2021, PMC filed a motion for summary judgment, arguing that Ms. Theriot failed to produce an expert witness in support of her claims against PMC. PMC also filed an exception of prescription, solely arguing the legal theory of constructive knowledge. According to PMC, Ms. Theriot first became aware of

4

a potential claim against Dr. Rau and PMC on August 12, 2015, when she noticed hoarseness when she tried to talk. PMC argued that as the initial complaint was not filed until July 19, 2017, her claims against PMC were prescribed as a matter of law. PMC attached an excerpt from Ms. Theriot's deposition to its memorandum in support of its exception of prescription, highlighting the following exchange:

> Q:   So when was the first time that you had some notion or idea that maybe Dr. Rau had done something wrong, you know, like what you alleged in the lawsuit?
>
> A:   The day after I got back home from the surgery when I tried to talk and it was like hoarseness.

On June 8, 2021, Dr. Rau filed his own exception of prescription, based on the same arguments advanced by PMC in its exception.

Ms. Theriot opposed the defendants' exceptions of prescription, contending that Dr. Rau reassured her during her follow-up care immediately after the surgery and subsequent visits that the hoarseness would get better. Ms. Theriot argued that the "continuing treatment rule"[1] was applicable as she was lulled into a course of inaction by Dr. Rau's reassurances to her.

Prior to the hearing on the exceptions and the motion for summary judgment, Ms. Theriot filed a second supplemental and amending petition, which added a subsection to include in the body of the petition a portion of the MRP complaint, which was attached to the original petition. The added subsection outlined the series of events wherein Ms. Theriot claims she first learned of the medical malpractice committed by the defendants. Ms. Theriot alleged in this

---

[1] Under the "continuing treatment rule," prescription will run against a plaintiff who has knowledge that her condition may be related to a physician's improper treatment "only if there is no effort by the physician to mislead or cover up information available to the plaintiff through inquiry or professional medical or legal advice during the continuing treatment." *Mitchell v. Baton Rouge Orthopedic Clinic, L.L.C.*, 2021-00061 (La. 10/10/21), 333 So. 3d 368, 375-76, reh'g denied, 2021-00061 (La. 1/28/22), citing *Carter v. Haygood*, 2004-0646 (La. 1/19/05), 892 So. 2d 1261, 1273.

5

second supplemental and amending petition that the August 24, 2016 examination by Dr. Simon was the first notice to her that the medical treatment provided by Dr. Rau was below the standard of care and resulted in permanent harm to her. Ms. Theriot further included the dates she saw Dr. Rau for follow-up care and was reassured by him that he did everything correctly. According to her second supplemental and amending petition, she saw Dr. Rau for follow-up care and continuing care in October 2015, December 2015, March 2016, June 2016, and August 2016, and was reassured by him that he did everything correctly and that it would take some time for her voice to get better. A hearing was set for July 19, 2021, for the defendants to show cause if they opposed the filing of Ms. Theriot's second supplemental and amending petition. Prior to the date of the hearing, both Dr. Rau and PMC answered Ms. Theriot's second supplemental and amending petition in the form of a general denial.

On July 19, 2021, a hearing was held on the exceptions of prescription filed by Dr. Rau and PMC, and the motion for summary judgment filed by PMC. At the hearing, the defendants argued that separate prescriptive periods applied to Ms. Theriot's informed consent claims and her claims of malpractice with regard to the surgery. The defendants focused on the consent issue, abandoned their claims of malpractice regarding the surgery, and argued that Ms. Theriot's claims as to lack of consent were clearly prescribed. The trial court overruled the exceptions of prescription on the issue of malpractice with regard to the surgery and granted the exceptions of prescription on the issue of consent. The trial court denied PMC's motion for summary judgment. On August 18, 2021, the trial court signed a judgment in accordance with its oral rulings, granting the defendants' exceptions on the sole issue of informed consent, denying PMC's motion for summary judgment, and designating the judgment as a final judgment as contemplated by La. C.C.P. art. 1915. Ms. Theriot appealed. PMC filed an application for a

6

supervisory writ of review. PMC's writ was referred to this panel, as the panel to which the appeal was assigned. *Theriot v. Physicians Medical Center, LLC and XYZ Insurance Company*, 2021 CW 1109 (La. App. 1 Cir. 12/6/21).

Upon examination of the record, this court determined that the August 18, 2021 judgment lacked appropriate decretal language, and remanded the matter to the trial court for the limited purpose of allowing it to sign a new judgment amending the August 18, 2021 judgment to provide proper decretal language. *Theriot v. Physicians Medical Center, LLC and XYZ Insurance Company*, 2021 CA 1468 (La. App. 1 Cir. 4/11/22). An amended final judgment was signed on April 18, 2022, which included the dismissal of Ms. Theriot's claims on the issue of informed consent.

## I. Ms. Theriot's Appeal

On appeal, Ms. Theriot contends the trial court erred as follows:

1. In granting defendants' exceptions of prescription at a hearing when it stated that Ms. Theriot's suit on the issue of informed consent is prescribed;

2. In granting exceptions of prescription based on informed consent that was never raised in the pleadings or the exceptions by either of the defendants;

3. In granting the exceptions of prescription based solely on Ms. Theriot's statement the day after surgery she experienced hoarseness when this isolated statement does not amount to actual or constructive notice of malpractice;

4. In failing to invoke the continuing treatment or relationship rule, a form of "contra non valentem," whereby prescription is suspended when there is continuous treatment by both Dr. Rau for several months and by PMC when Ms. Theriot underwent an esophagogastroscopy on August 5, 2016 and was told that she was fine;

5. In failing to recognize that Ms. Theriot first learned that her vocal cords

7

were paralyzed when she visited Dr. Simon on August 24, 2016;

6. In failing to recognize that Ms. Theriot first learned of the deficiency in the surgical consent forms when she retained counsel in February 2017;

7. In granting the exceptions of prescription based on informed consent when no evidence was presented by any party that Ms. Theriot gave consent to a thyroidectomy when she thought the surgical procedure would simply be a needle biopsy.

## LAW AND DISCUSSION

A physician has a duty to inform the patient of (1) the nature and purpose of the procedure, and (2) the known material risks that may arise from the noticed procedure. *Richard v. Colomb*, 2004-1145, 2004-1146 (La. App. 1 Cir. 6/29/05), 916 So. 2d 1122, 1127, writ denied, 2005-1939 (La. 2/3/06), 922 So. 2d 1182. According to Ms. Theriot, her lack of informed consent claim is two-fold.[2] She alleges that neither Dr. Rau nor PMC informed her that she would be undergoing a thyroidectomy, as opposed to what she believed was to be a needle biopsy, and neither advised her of the material risks that may arise during that procedure.

*Prescription*

Louisiana Revised Statutes 9:5628 establishes the time for filing medical malpractice actions. The statute sets forth two prescriptive limits, namely one year from the date of the alleged act or one year from the date of discovery with a three-year limitation from the date of the alleged act, omission, or neglect to bring such claims. *Carter v. Haygood*, 2004-0646 (La. 1/19/05), 892 So. 2d 1261, 1268.

---

[2] Informed consent is a claim that can be separate from a medical malpractice claim. *Patterson v. Peterson*, 2019-1604 (La. App. 1 Cir. 8/3/20), 310 So. 3d 185, 190, writ denied, 2020-01076 (La. 11/10/20), 303 So. 3d 1041. Such claims for lack of consent fall under the purview of the Medical Malpractice Act. *Lugenbuhl v. Dowling*, 96-1575 (La. 10/10/97), 701 So. 2d 447, 452. See also *Wilson ex rel. Wilson v. Landry*, 98-2365 (La. App. 1 Cir. 12/28/99), 748 So. 2d 655, 658, writ denied, 2000-0260 (La. 3/24/00), 758 So. 2d 155.

Prescription commences when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort. *Campo v. Correa*, 2001-2707 (La. 6/21/02), 828 So. 2d 502, 510. Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry. *Id.* at 510-11. Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead. *Id.* at 511. Such information or knowledge as ought to reasonably put the alleged victim on inquiry is sufficient to start running of prescription. *Id.* Nevertheless, a plaintiff's mere apprehension that something may be wrong is insufficient to commence the running of prescription unless the plaintiff knew or should have known through the exercise of reasonable diligence that his problem may have been caused by acts of malpractice. *Id.* Even if a malpractice victim is aware that an undesirable condition has developed after the medical treatment, prescription will not run as long as it was *reasonable* for the plaintiff not to recognize that the condition might be treatment related. The ultimate issue is the *reasonableness* of the patient's action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant's conduct. *Id.*

### *Burden of Proof*

The burden of proving prescription ordinarily lies with the party raising the exception; however, when prescription is evident from the face of the petition, the burden shifts to the plaintiff to show the action has not prescribed. *Mitchell v. Baton Rouge Orthopedic Clinic, L.L.C.*, 2021-00061 (La. 10/10/21), 333 So. 3d 368, 374, reh'g denied, 2021-00061 (La. 1/28/22). A petition is not prescribed on its face if it is filed within one year of discovery and particularly alleged facts show the patient was unaware of malpractice before that date, so long as the filing delay was not willful, negligent, or unreasonable. *In re Medical Review Panel of Heath,*

9

2021-01367 (La. 6/29/22), 345 So. 3d 992, 996. Whether the complaint is prescribed on its face is purely a question of law, subject to *de novo* review. *Id.* at 996-97.

To determine who bears the burden of proof, the following questions must be answered: (1) was the complaint filed within one year of the date of the alleged acts of malpractice? (2) if not, was the complaint filed within one year of the date of discovery of the alleged acts of malpractice? *Id.* If the plaintiff relies upon discovery as the trigger of prescription, the following must be answered: (1) did the plaintiff allege with particularity he or she was unaware of the malpractice prior to the alleged date of discovery; and (2) was the plaintiff's delay in discovering the malpractice reasonable? The petition must state with particularity the act of alleged malpractice and the date it was discovered, and these questions must be answered solely upon the allegations of the complaint. *Id.*

Ms. Theriot contends that the first time she learned that a thyroidectomy was performed and not a needle biopsy was "sometime around February 2017" when she sought counsel for her medical issues and obtained a copy of her medical records. However, her petitions do not contain this alleged date of discovery, nor do the petitions contain any allegations that Ms. Theriot was unaware of the lack of informed consent prior to February 2017. Thus, we find Ms. Theriot's informed consent claim is prescribed on its face, and she had the burden of proving this claim was not prescribed.[3]

---

[3] With regard to her claim that her vocal cords were paralyzed during the surgical procedure, Ms. Theriot alleged in her second supplemental and amending petition that she first learned of the medical malpractice after the result of the fiberoptic laryngoscopy performed by Dr. Simon on August 24, 2016; she saw Dr. Rau for follow-up care and continuing care in October 2015, December 2015, March 2016, June 2016, and August 2016, and was reassured by him each time that he did everything correctly and that it would take some time for her voice to get better; and on August 5, 2016, Dr. Rau performed an esophagogastroscopy and told her that there was nothing wrong.

## Standard of Review

The standard of review of a judgment pertaining to an exception of prescription turns on whether evidence is introduced at the hearing of the exception. *Mitchell*, 333 So. 3d at 373. Louisiana Code of Civil Procedure article 931 provides that evidence may be introduced to support or controvert an exception of prescription. If no evidence is submitted at the hearing, the exception must be decided upon the facts alleged in the petition with all allegations accepted as true. *Id.* When evidence is introduced at the hearing, this court need not accept the allegations of the petition as true, and the trial court's decision is reviewed under a manifest error-clearly wrong standard of review. *Id.*

## Exceptions of Prescription

As noted above, at the July 19, 2021 hearing, the defendants abandoned their exceptions of prescription regarding Ms. Theriot's claims of malpractice with regard to the surgery, focusing instead on her informed consent claims. Counsel for PMC recognized that Ms. Theriot's argument that on-going treatment suspended the running of prescription with regard to malpractice for the surgery was supported "by case law." Counsel for Dr. Rau acknowledged that whether the surgery fell below the standard of care was "a live issue. ...that has to go to trial." The defendants argued that the malpractice that may have occurred during surgery was a separate issue from consent to the surgery, and Ms. Theriot "had to − by common sense, know within two weeks, what procedure she had." During the hearing, the trial court inquired as to when Ms. Theriot first learned that she had something other than a needle biopsy. Counsel for Dr. Rau responded that while Ms. Theriot testified that she thought she was going in for a needle biopsy, there was nothing in Dr. Rau's chart to show that a needle biopsy was ever discussed.

Following the arguments of counsel, the trial court ruled as follows:

11

As far as the issue of medical malpractice, the Court finds that this matter has not prescribed. As far as falling below a standard of care, the Court is going to overrule the Prescription Exception.

The reason why the Court is going to do that, the Court based on the evidence and the exhibits that were attached, shows that there was continuing treatment. And I think that would invoke the continuing treatment rule that [Ms. Theriot's counsel] was talking about – which is an Exception to Prescription requires the plaintiff to establish that there was a continuing treatment relationship, with the physician, which is more than a perfunctory – during which the physician engaged in conduct which served to prevent the patient from availing herself of the cause of action, such as attempting to rectify an alleged act.

And here, it looks like, you know, Doctor Rau was trying to treat the patient, to the best of his ability. But that patient-physician relationship prevented her from, earlier on, seeking second opinions.

Also the Court is going to sustain the Prescription Exception, when it comes to consent. Whether or not she signed a consent form to have the surgery; that is something she should have known on the day of surgery – at least, she should have known within the prescriptive period.

So, this Court will sustain that objection.

In connection with the hearing, a copy of Ms. Theriot's deposition and Dr. Rau's medical chart were introduced into evidence. Counsel for Ms. Theriot also introduced into evidence the August 5, 2016 operative report relating to the esophagogastroscopy, which was contained within Dr. Rau's medical chart. Since evidence was introduced at the hearing, we review the trial court's decision granting the defendants' exceptions of prescription on the issue of consent under the manifest error-clearly wrong standard.[4]

In her deposition, Ms. Theriot testified that she first consulted with Dr. Rau on July 30, 2015. According to Ms. Theriot, Dr. Rau walked into the room she was in, opened her file and read that she needed a needle biopsy, closed the file and said "we can do this tomorrow." Ms. Theriot testified that she could not "do it" until the following week. According to Ms. Theriot, Dr. Rau did not discuss the

---

[4] Neither defendant filed an answer to the appeal challenging the trial court's ruling on "the issue of medical malpractice" with regard to the surgery. See La. C.C.P. art. 2133.

12

ultrasound report with her, nor did he discuss options. Ms. Theriot testified that Dr. Rau sent orders to PMC, and on August 6, 2015, Ms. Theriot went to PMC where she signed a consent for anesthesia for the "procedure" she thought was a needle biopsy.[5] Ms. Theriot testified that nobody read the consent form to her; she signed it without reading it and returned it to the person who handed it to her. Ms. Theriot further testified that on August 11, 2015, an anesthesiologist came in to put her to sleep prior to the procedure, but did not indicate that she was there for a thyroidectomy. Ms. Theriot did not recall seeing Dr. Rau on August 11, 2015, prior to the procedure, and testified that he never explained to her that he recommended a thyroidectomy or told her the risks and complications of a thyroidectomy. According to Ms. Theriot, Dr. Haydel told her that she was going to Dr. Rau for a needle biopsy, and so she knew "that's what I was going to be getting. I didn't know I was going to be getting a removal of my thyroids." Ms. Theriot testified that her complaint against Dr. Rau was that the procedure "was supposed to be a needle biopsy. He should have checked my paperwork...or explained anything deeper...he should have when I went to my first visit about what he was going to do or what could happen. He should have talked to me about all of that and he didn't. I was a waitress 36 years. If he told me I'd be hoarse, there's no way I could have continued." According to Ms. Theriot, she first learned that there was a timeout during the surgery and her sister signed a consent form when she talked to an attorney.[6]

---

[5] The consent form, referenced by Dr. Rau in his brief, was not introduced into evidence in connection with the exception.

[6] On appeal, Ms. Theriot relies upon Ms. Cantrelle's deposition in support of her argument that Ms. Cantrelle did not have authority to sign the consent form and never told Ms. Theriot that she signed the form. However, Ms. Cantrelle's deposition was not introduced into evidence in connection with the exceptions of prescription.

Ms. Theriot testified that the day she got home after the surgery, she experienced hoarseness when she tried to talk. She testified that she continued to see Dr. Rau because "he kept telling me to come." According to Ms. Theriot:

I'd go for my visit and I'd asked him about my hoarseness and my breathing. He said as far as your breathing, he says lose weight and maybe you can breathe better....[H]e gave me steroid shots a couple of my visits to see him. And the voice and the breathing, the hoarseness wasn't getting better. But he said...I don't know what to tell you because...I know I didn't do anything. So he said you had to do something. I said, well, what could I have done? He said...I don't know, but it wasn't me. So it had to be you....After that...I gave up. I stopped going.

Ms. Theriot's medical records indicate that she underwent an esophagogastroscopy, performed by Dr. Rau, on August 5, 2016, at PMC, which indicated no "atrophy or paralysis of the [vocal] cord at all on exam." Ms. Theriot testified in her deposition that following the esophagogastroscopy, Dr. Rau told her "there wasn't a thing wrong with my vocal cord and he didn't see no reason why I was having problems breathing or having hoarseness. He said that I was just making -- he thought I was just making that up."

In her brief to this court, Ms. Theriot contends that she was not given an opportunity to oppose the issue of informed consent because neither defendant raised any defense of prescription on the issue of informed consent in their exceptions heard by the trial court on July 19, 2021. At the July 19, 2021 hearing, Ms. Theriot did not object to the defendants' argument that any malpractice that may have occurred during the surgery was a separate issue from consent to the surgery. Because Ms. Theriot did not raise this issue in the trial court, this court will not consider an issue raised for the first time on appeal. See *Dougherty v. Dougherty*, 2021-0433 (La. App. 1 Cir. 3/29/22), 341 So. 3d 669, 679 n.20.

Relevant hereto, Ms. Theriot assigns as error the trial court's failure to recognize that she first learned of the deficiency in the surgical consent forms when she retained counsel in February 2017, and its granting of the exceptions of

14

prescription based on informed consent when no evidence was presented that she gave consent to a thyroidectomy when she thought the surgical procedure would simply be a needle biopsy. Ms. Theriot also assigns as error the trial court's failure to invoke the "continuing treatment rule" when there was continuous treatment by both Dr. Rau for several months and by PMC when Ms. Theriot underwent an esophagogastroscopy performed by Dr. Rau on August 5, 2016, and was told by Dr. Rau she was fine.

We first address Ms. Theriot's contention that her suit is not prescribed because she did not know she had a thyroidectomy until she sought legal representation in February 2017. The law of prescription does not require that the patient be informed by a medical practitioner or an attorney of possible malpractice before the prescriptive period begins to run. *Medical Review Panel Proceeding of Williams v. Lewis*, 2008-2223 (La. App. 1 Cir. 5/13/09), 17 So. 3d 26, 30. When a party has sufficient information to incite curiosity, or put a reasonably minded person on guard and call for inquiry, she has the constructive knowledge necessary to start the running of prescription. *Id.* It is also well-settled that the prescriptive period for a medical malpractice cause of action arises upon the occurrence of the injury when the damages are immediately apparent. *Mitchell*, 333 So. 3d at 381.

In support of her contention that her suit is not prescribed, Ms. Theriot cites *Nestor v. Louisiana State University Health Sciences Center in Shreveport*, 40,378 (La. App. 2 Cir. 12/30/05), 917 So. 2d 1273, writ denied, 2006-0221 (La. 4/24/06), 926 So. 2d 551. In *Nestor*, the plaintiff brought a medical malpractice claim arising from back surgery that was performed at a different level than originally indicated on the consent form. The Louisiana Second Circuit Court of Appeal affirmed the trial court's denial of the defendant's exception of prescription as to the issue of informed consent for the following reasons:

15

[W]e find no evidence that clearly establishes that the Nestors understood that surgery was performed at a different level than originally shown on the consent form and that a complication had occurred prior to their consultation with Dr. Polin. Moreover, despite Mrs. Nestor's testimony that they received copies of the medical reports every time her husband went to the VA for clinical treatment, this would not necessarily put a lay person on notice that a surgical procedure was done differently than agreed to on a consent form. Such a conclusion would equate to holding a lay person to the same degree of knowledge as a medical professional. Furthermore, we do not find that the Nestors' ignorance of these facts was wilful [sic], negligent, or unreasonable.

*Id.* at 1282.

Ms. Theriot argues that she thought she was undergoing a needle biopsy on August 11, 2015. Neither Dr. Rau nor any nurse from PMC approached Ms. Theriot prior to her surgery asking her to sign a surgical consent form. Ms. Theriot was never informed she was having a thyroidectomy and never gave consent to a thyroidectomy. Ms. Theriot contends that while the trial court opined that she should have known whether she signed a consent form on the day of surgery or within the prescriptive period, she did not know she was required to sign a consent form, which is essentially for the benefit of the physician and hospital. According to Ms. Theriot, she was always under the impression that she was having a needle biopsy that was suggested by both the ultrasound and Dr. Haydel's referral to Dr. Rau. She firmly stated that she did not know she had a thyroidectomy until she sought legal representation in February 2017.

Dr. Rau argues that the trial court correctly determined that Ms. Theriot had sufficient notice that she did not sign a consent form to commence the running of prescription when she began to experience complications on August 11, 2015. According to Dr. Rau, it is unreasonable to suggest that Ms. Theriot did not know of the lack of consent until her attorney obtained the medical chart. Dr. Rau cites *Jimerson v. Majors*, 51,097 (La. App. 2 Cir. 1/11/17), 211 So. 3d 651, in support of his contention that the trial court was not manifestly erroneous in finding that Ms.

16

Theriot's informed consent claim is prescribed. *Jimerson* involved a medical malpractice claim filed on September 2, 2010, against the obstetrician/gynecologist who performed a hysterectomy on the plaintiff on August 19, 2008. The trial court granted an exception of prescription, and on appeal, the plaintiff argued that the discovery rule applied to suspend prescription because she did not discover that the 2008 hysterectomy should not have been performed until November 2009, when another specialist informed her that it was negligent to perform a hysterectomy on a 24-year-old woman. *Id.* at 655-56. The Second Circuit Court of Appeal affirmed the ruling, finding the trial court was within its discretion in determining that a reasonable person with the plaintiff's education and intelligence (she was a registered nurse on the labor and delivery unit of a hospital) would have been put on notice long before November 2009. The court noted that from August 2008 to June 2009, the plaintiff made 24 visits to other specialists. In addition, the plaintiff stated in her deposition that three weeks after the hysterectomy, she was informed by a specialist in urology that her current condition was due to complications from the hysterectomy surgery. *Id.* at 657. Dr. Rau also relies on *Davidson v. Glenwood Resolution Authority, Inc.*, 47,640 (La. App. 2 Cir. 1/23/13), 108 So. 3d 345, wherein the Second Circuit Court of Appeal affirmed the trial court's finding that the plaintiff's medical malpractice claim, filed on April 24, 2009, was prescribed. On April 6, 2006, the defendant doctor performed surgery on the plaintiff to repair an abdominal aortic aneurysm; a piece of a retractor used during the surgery was inadvertently left in the plaintiff's abdominal cavity. On August 15, 2006, a CT scan revealed a metallic structure in the plaintiff's pelvis. *Id.* at 348. The court noted that the trial court specifically found the defendant doctor, who testified at the hearing on the exception, to be "very credible" when he testified that he called the plaintiff after being contacted about the CT scan on August 15, 2006, and told the plaintiff that he was concerned the metal object in the plaintiff's pelvis could be

17

related to the surgery he performed. *Id.* at 351.

PMC argues that Ms. Theriot's assertion that she first learned from her attorney on February 17, 2017, that she underwent a thyroidectomy rather than a needle biopsy is unsupported by the record. PMC points to an August 4, 2015 phone memo contained in Ms. Theriot's medical records that reflects a phone call to "FR" from "pt" with a phone number and a notation "schedule thyroidectomy." PMC also refers to a prescription dated October 29, 2015,[7] with Ms. Theriot's name on it for "Synthroid." The page from Ms. Theriot's medical records contains a notation, "E890 post surgical thyroidectomy." Thus, PMC contends that Ms. Theriot had knowledge of the precise nature of her surgery on October 29, 2015.

We note that there is no evidence that Ms. Theriot called to "schedule thyroidectomy." According to her testimony, she scheduled a procedure that "was supposed to be a needle biopsy." Nor is there evidence that Ms. Theriot received the October 29, 2015 prescription contained in her medical records, or that the notation was on the original prescription. Moreover, there is no evidence in the record that Ms. Theriot knew a consent form was required before surgery,[8] nor is there evidence that the difference between a needle biopsy and a thyroidectomy is immediately apparent, such that the prescriptive period began on the day of surgery. See *Mitchell*, 333 So. 3d at 381.

Prescription will not run as long as it was *reasonable* for the plaintiff not to recognize that the condition might be treatment related. The ultimate issue is the *reasonableness* of the patient's action or inaction, in light of his education, intelligence, the severity of the symptoms, and the nature of the defendant's

---

[7] It is unclear from the record whether the date of the prescription is "10/29/15" or "10/25/15."

[8] We note that La. R.S. 40:1157.1 does not require written consent to medical treatment. Rather, pursuant to La. R.S. 1157.1(A), such written consent, if obtained, is presumed to be valid and effective. Where consent is obtained other than in accordance with La. R.S. 1157.1(A), such consent is subject to proof according to the rules of evidence in ordinary cases. La. R.S. 1157.1(C).

18

conduct. *Campo*, 828 So. 2d at 511. Here, Ms. Theriot testified that she completed the 11th grade and worked as a waitress. Thus, her education and intelligence regarding medical procedures are clearly distinguishable from the plaintiff in *Jimerson*, who was a registered nurse on the labor and delivery unit of a hospital. Moreover, unlike in *Davidson*, there is no testimony from Dr. Rau regarding his interactions with Ms. Theriot. According to Ms. Theriot's testimony, she received no explanation from Dr. Rau as to the nature of either of the procedures at issue. Relying on a theory of common sense, the defendants offered no evidence to the contrary. Similar to *Nestor*, in this case there is no evidence that Ms. Theriot understood that Dr. Rau was performing a different procedure than the one for which Dr. Haydel referred her. Nor is there any evidence that Ms. Theriot was placed on notice sufficient to excite attention and put her on guard and call for inquiry that a different procedure was performed prior to the time that she returned to Dr. Haydel following the August 5, 2016 esophagogastroscopy, and he referred her to Dr. Simon.[9] Furthermore, there is no evidence that Ms. Theriot's ignorance of these facts was willful, negligent, or unreasonable. Based on the record before us, we find that Ms. Theriot met her burden of proving she discovered the lack of informed consent less than one year before she filed her medical malpractice complaint on July 19, 2017, and that the delay in discovery was reasonable. Thus, we find the trial court erred in granting the defendants' exceptions of prescription on the issue of informed consent, and dismissing these claims with prejudice. Based on this finding, we pretermit discussion of the applicability of the "continuing treatment rule." Accordingly, we reverse the trial court's April 18,

---

[9] Ms. Theriot also assigns as error the trial court's failure to recognize that she first learned that her vocal cords were paralyzed when she visited Dr. Simon on August 24, 2016. As the sole issue on appeal is whether the trial court was clearly wrong in granting the defendants' exceptions of prescription on the issue of informed consent, we do not address any issues relating to the prescriptive period as it relates to any malpractice that may have occurred in connection with the performance of the surgery.

2022 judgment granting the exceptions of prescription on the issue of informed consent, and dismissing Ms. Theriot's informed consent claims with prejudice.

## II. PMC's Application for Supervisory Writ of Review[10]

In determining whether to exercise supervisory jurisdiction, this court looks to the criteria set forth by the Louisiana Supreme Court in *Herlitz Construction Company, Inc. v. Hotel Investors of New Iberia, Inc.*, 396 So. 2d 878 (La. 1981) (per curiam). In that case, the Louisiana Supreme Court held that appellate courts should exercise supervisory jurisdiction in cases where the overruling of the exception is arguably incorrect, when a reversal will terminate the litigation, and when there is no dispute of fact to be resolved, such that judicial efficiency and fundamental fairness to the litigants would dictate that the merits of the application for supervisory writs should be decided in an attempt to avoid the waste of time and expense of a possibly useless future trial on the merits. *Id.*

In its application for supervisory writs, PMC contends the trial court erred as follows:

1. In denying its motion for summary judgment when the sole issue pertaining to negligence, *i.e.*, informed consent, had prescribed;

2. In denying its motion for summary judgment as there was no expert testimony that the nurses breached the standard of care regarding the medical treatment of the patient; and

3. In denying the exception of prescription regarding the medical malpractice cause of action when there was no "continuing treatment" relationship to meet the exception of *contra non valentem*.

---

[10] On August 12, 2021, PMC filed its notice of intention to apply for supervisory writ from the trial court's July 19, 2021 ruling denying its motion for summary judgment. The trial court signed a judgment in accordance with its oral ruling on August 18, 2021. As noted above, this court determined that the August 18, 2021 judgment lacked appropriate decretal language and remanded the matter to the trial court. On April 18, 2022, the trial court signed an amended final judgment.

20

The underlying premise of PMC's application for supervisory writs is that Ms. Theriot asserted two separate and independent causes of action, the alleged failure of PMC and Dr. Rau to obtain informed consent, and the alleged medical malpractice of Dr. Rau in performing the thyroidectomy; and that Ms. Theriot made no allegations that PMC committed medical practice during the surgery that caused Ms. Theriot's injuries. Thus, PMC contends that as a result of the trial court's ruling granting its exception of prescription on the issue of informed consent, it is entitled to summary judgment. According to PMC, while Ms. Theriot's expert, Dr. Herbert Rubin, testified regarding nursing failure with informed consent, Dr. Rubin did not testify that the nurses committed medical malpractice with regard to the surgery. PMC further argues that it cannot be vicariously liable for the independent acts of alleged malpractice by Dr. Rau in performing the thyroidectomy because PMC did not have the right of control over the provision of medical care to Ms. Theriot. PMC further contends that any malpractice action relating to Dr. Rau's performance of the thyroidectomy has prescribed as to PMC because Ms. Theriot has failed to establish a continuing treatment relationship with PMC after August 11, 2015.

Taking into consideration our finding that the trial court erred in granting the defendants' exceptions of prescription on the issue of informed consent, we find that a review of the merits of PMC's writ application would not terminate the litigation. PMC's writ application was based upon the premise that its exception of prescription on the issue of informed consent was granted. As Ms. Theriot's informed consent claims against both Dr. Rau and PMC remain pending, consideration of the writ application would be judicially inefficient and would result in piecemeal litigation. See Champagne v. USAA Casualty Insurance Company, 2016-1079 (La. App. 1 Cir. 4/9/18), 2018 WL 1723044, *4 (unpublished). Therefore, we decline to exercise our supervisory jurisdiction, and

21

deny PMC's writ application.

## CONCLUSION

For the above and foregoing reasons, the trial court's April 18, 2022 amended judgment granting exceptions of prescription on the sole issue of informed consent filed on behalf of defendants, Dr. Frederick Rau and Physicians Medical Center, LLC, and dismissing the claims of the plaintiff, Jennifer Theriot, on the issue of informed consent is reversed. The judgment is affirmed in all other respects. The application for supervisory writs filed by defendant Physicians Medical Center, LLC, is denied. Costs are assessed equally against the defendants, Dr. Frederick Rau and Physicians Medical Center, LLC.

**JUDGMENT REVERSED IN PART; WRIT DENIED.**